Ira W. NICHOL, Plaintiff–Appellant, Cross–Appellee,

v.

PULLMAN STANDARD, INC., a Delaware corporation, et al., Defendants–Appellees, Cross–Appellants.

Nos. 88–2555, 88–2653 and 88–3055.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1989.

Decided Nov. 6, 1989.

Joseph S. Reid, Highland, Ind., Joel Sprayregen, Clifford Yuknis, Shefsky, Saitlin & Froelich, Chicago, Ill., Mark E. Schmidtke, John E. Hughes, Hoeppner, Wagner & Evans, Valparaiso, Ind., for plaintiff-appellant, cross-appellee.

William J. Marshall, Wilmette, Ill., Charles Kelso, Robert C. Christenson, Roger K. Quillen, Fisher & Phillips, Atlanta, Ga., for defendants-appellees.

Before CUMMINGS and POSNER, Circuit Judges, and GORDON, Senior District Judge.*

CUMMINGS, Circuit Judge.

In 1983, Ira W. Nichol signed severance agreements in which he relinquished his rights to long-term disability benefits under his company's disability plans.

In 1985, Nichol commenced an action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, seeking to avoid the terms of the severance agreements and to renew his eligibility for disability benefits. A bench trial was held on June 1 and 2, 1988. At the close of Nichol's evidence the defendants, Pullman Standard, Inc.[1] and the former and present administrators of Pullman's disability plans (hereafter collectively, "Pullman") moved for an involuntary dismissal of the action under Federal Rule of Civil Procedure 41(b). The district court granted this motion but denied Pullman's request for costs and attorneys' fees. Both parties appeal. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Nichol was employed by Pullman Standard, Inc. on August 27, 1979, as Director of Engineering. He was later promoted to Vice President–Engineering. On February 27, 1982, six days after his fifty-ninth birthday, Nichol suffered a heart attack and was hospitalized. As a participant in Pullman's short-term and long-term disability plans, Nichol was entitled to seven weeks of salary continuation at full pay plus six additional weeks at half pay before becoming eligible for long-term disability benefits. Once eligible for long-term disability, Nichol would have been entitled to monthly payments equal to fifty percent of his monthly base salary until the end of his disability or until he reached age sixty-five, whichever occurred first. In addition, Pullman's long-term disability plan provided for a continuation of medical, dental, and vision insurance coverage.

Five weeks into his recuperation, on April 2, 1982, Nichol was visited at his home by Jack Kruizenga, President and Chief Executive Officer of Pullman. Kruizenga proposed that Nichol continue at full salary until he reached age sixty. He also suggested that the company would work on agreements to cover the period between Nichol's sixtieth birthday and his sixty-second birthday, when Nichol would become eligible for early retirement.

* The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

1. Pullman Standard, Inc. is no longer in business. The company was engaged in manufacturing and selling railroad cars and component equipment.

In early February 1983, Nichol wrote to Kruizenga asking to return to work.[2] In response, Nichol received a telephone call from John Rozner, Head of Personnel, informing him that agreements such as Kruizenga had proposed in April of 1982 were being prepared. Nichol received these agreements in due course. He consulted with his attorney, proposed various changes, some of which were incorporated, and eventually signed the agreements on March 24, 1983. The agreements provided that Nichol would be retained by Pullman in the capacity of an independent consultant until he reached age sixty-two. The agreements further provided that Nichol would be compensated at a rate equal to one half of his previous annual salary. Finally, the agreements provided that Nichol would continue to be covered by Pullman's medical, dental, vision, and life insurance programs and that he would continue to accrue pension credit until he reached early retirement. In return for this compensation package, Nichol agreed to relinquish any other benefits to which he may have been entitled.[3]

From the time of his heart attack through February 21, 1983 (his sixtieth birthday), Nichol received his full salary. Thereafter, until his sixty-second birthday on February 21, 1985, Nichol received half pay. Shortly after his sixty-second birthday, Nichol was placed on early retirement. As a result of early retirement, his dental and vision care insurance coverage were terminated and his life and medical insur-ance coverage were shifted to the Pullman early retirement plan. Under that plan, Pullman replaced Nichol's $140,000 life insurance coverage with a total of $35,000 of coverage which was later reduced to $31,-500 and then to $28,000. All of these transactions were in strict compliance with the terms of the severance agreements and the Pullman early retirement plan.

Nichol filed his original complaint on March 22, 1985. A second amended complaint, filed on June 23, 1986, included the ERISA claim as well as a pendent state law claim asserting fraud and willful misconduct. The district court dismissed the state law claim as preempted by ERISA, but denied Pullman's motion for summary judgment on the ERISA claim. Following the presentation of Nichol's evidence at trial, District Judge Marshall granted Pullman's Rule 41(b) motion,[4] stating that Nichol had, "knowingly and intentionally and voluntarily waived [long-term disability benefits]."

## II. STANDARD OF REVIEW

"In granting a Rule 41(b) motion, a district court's factual findings are made pursuant to Rule 52(a), and may not be set aside unless clearly erroneous." *Furth v. Inc. Publishing Co.*, 823 F.2d 1178, 1179 (7th Cir.1987). However, determining that a plaintiff has no right to relief is separate from determining that the district court's fact findings are clearly erroneous. *Id.* (citing 5 J. Moore, J. Lucas, and J. Wicker, *Moore's Federal Practice,* ¶ 41.13[1], at 41-

---

**2.** Nichol underwent open heart surgery on July 26, 1982, and his medical costs were paid by Pullman. The parties now agree that Nichol was permanently disabled throughout the period at issue in this case.

**3.** The agreements provided in pertinent part:
It is to be expressly understood that the arrangements set forth herein for your benefit are in lieu of any and all benefits whether in the form of vacation, salary continuation, long-term disability, severance or any other form of compensation.... Appellant's appendix at 72.

**4.** In pertinent part, Rule 41(b) of the Federal Rules of Civil Procedure reads as follows:
After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).
Rule 52(a) provides in pertinent part:
In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon,....

166 to 41–167 (2d ed. 1986)). Therefore, we must determine as a matter of law whether the facts as established by the district court demonstrate that Nichol is entitled to long-term disability benefits.

## III.  THE SEVERANCE AGREEMENTS

As Judge Marshall noted in his memorandum opinion, Nichol does not dispute that the agreements, if effective, preclude his recovery of any long-term disability benefits.  Instead, Nichol argues that the agreements are invalid.  Specifically, Nichol appears to be arguing that the agreements themselves constitute a denial of his long-term disability benefits in violation of the provisions of Section 404 of ERISA, 29 U.S.C. § 1104.  Those provisions require plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries," and "in accordance with the documents and instruments governing the plan."  Nichol relies on language in the Pullman benefit plans requiring an "attending physician's statement" [5] to argue that Pullman officials should not have relied on Nichol's own statements about his health, but rather were under a duty to investigate his state of health independently before encouraging him to sign the severance agreements.

The gist of Pullman's argument is that the duties imposed by Pullman's benefit plan are not applicable to Nichol's decision to sign the proposed severance agreements, and that the agreements, once signed, released Pullman from all plan-mandated duties it may have owed to Nichol.

Nichol argues that *Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388 (7th Cir.1983), and *Central States Pension Fund v. Central Transport, Inc.*, 698 F.2d 802 (6th Cir. 1983), reversed on other grounds, 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447, support the proposition that Pullman had an affirmative duty to investigate Nichol's eligibility for long-term disability benefits.  Neither *Wolfe* nor *Central States* recognized a statutory duty.  Rather, in each case the court looked to the terms of the company plan to supply the duty.  Consequently, Pullman argues that at most these cases would require compliance with a plan-mandated duty, and that once Nichol waived his rights under the plan, no such duty existed.

We need not decide the merits of this difference in approach, because even adopting Nichol's view, we agree with Judge Marshall's finding that Nichol failed to adduce sufficient evidence to withstand a Rule 41(b) motion to dismiss.

The obligations of plan fiduciaries are indeed exacting.  The Supreme Court has recently held that a plan participant who challenges a denial of benefits resulting from a fiduciary's plan interpretation is entitled to a *de novo* review of that denial.  *Firestone Tire & Rubber Co. v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).  Furthermore, the Court held that *de novo* review is appropriate "regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest."  *Id.* 109 S.Ct. at 956.

*Firestone* does nothing to buttress Nichol's case.  *Firestone* requires *de novo* review of plan interpretations that result in the denial of benefits.  It is doubtful whether Kruizenga's proposal to supplant the terms of Pullman's benefit plans with

---

**5.**  The Pullman Standard Employee Relations Policy BEN–04 provides as follows:

   1.  Upon notification by the Payroll Department that an employee has exhausted Salary Continuance Benefits (Policy BEN–03), the Human Resources Department, Pullman Incorporated, will send the employee the following forms for completion and return to the Human Resources Department:

   A.  Claim for Monthly Extended Disability Benefits ... for completion of the employee's statement section.

   B.  Reimbursement Agreement ... for signature by the employee and a witness.

   C.  Attending physician's statement for completion by the employee's physician.

   2.  Upon receipt of the completed forms, the Benefits section of the Human Resources Department, Pullman Incorporated, will review the forms completed by the employee and the physician and complete the employer's statement section forwarding the completed form to the Prudential Insurance Company for determining the employee's eligibility for benefits.

Appellant's appendix at 55–56.

an alternative severance arrangement fashioned specifically for Nichol can be considered a plan interpretation within the *Firestone* case. Even if the proposed severance agreement did involve a plan interpretation, the record does not indicate that Judge Marshall erroneously applied an arbitrary and capricious standard rather than a *de novo* standard in arriving at his decision that Nichol knowingly waived his long-term disability benefits.

Finally, it is evident that Nichol does not consistently seek strict enforcement of the plan provisions. He does not object to being kept on full salary for an entire year following his heart attack even though he was entitled to only seven weeks at full salary under the company disability plans. In effect Nichol seems to be arguing that he can freely negotiate an increase in his benefits but that negotiations resulting in a decrease in benefits are void. There is nothing in Nichol's proffered arguments to support this proposition.

■ In our view, Nichol does have the power to contract away his long-term disability benefits. In response to a question posed at oral argument, Nichol's counsel conceded that employees have the power to waive entitlement to benefits under a disability benefit plan such as the plan involved here. The ERISA statute itself seems to support this view. Although the statute requires pension plans to include provisions prohibiting the assignment or alienation of pension benefits, the statute appears to exempt from this requirement welfare plan benefits such as those waived by Nichol here. See ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1) (anti-alienation provision) and ERISA § 201(1), 29 U.S.C.

§ 1051(1) (exemption from anti-alienation provision for welfare benefit plans).[6]

Only the Ninth Circuit has directly addressed the applicability of ERISA's anti-alienation provision to welfare benefit plans. *Franchise Tax Board v. Construction Laborers Vacation Trust*, 679 F.2d 1307 (1982) (vacated on jurisdictional grounds, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). *Franchise Tax Board* has had a rather confused aftermath. If the case is still valid, it would support the proposition that Nichol's waiver of his disability benefits was void. The case arose when the California Tax Board attempted to collect delinquent taxes from the assets of the taxpayers' vacation trust fund. The fund was an ERISA welfare benefit plan. The Ninth Circuit held that extending anti-alienation protection to the vacation fund was "consistent with the statute ... if not demanded by it." *Id.* at 1309. If Nichol's waiver of his benefits constitutes alienation of those benefits within the meaning of the statute, the *Franchise Tax Board* holding suggests that Nichol's waiver is invalid. In dissent, Judge Tang persuasively argued that the district court was without jurisdiction because the "prayer for relief [was] grounded purely upon state law and [sought] recovery only against an in-state defendant." *Id.* Judge Tang further argued that ERISA does not preempt state law attempts to attach pension welfare benefits because ERISA welfare benefit plans are specifically excluded from ERISA's anti-alienation protection by ERISA § 201(1), 29 U.S.C. § 1051(1).[7] The Supreme Court granted certiorari and vacated the Ninth Circuit's decision, agreeing with Judge Tang that the district court had

**6.** Section 206(d)(1) of ERISA, 29 U.S.C. § 1056(d)(1), provides: "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Section 201(1) of ERISA, 29 U.S.C. § 1051(1), provides: "This part shall apply to any employee benefit plan ... other than—(1) an employee welfare benefit plan." Section 3(1) of ERISA, 29 U.S.C. § 1002(1), provides in pertinent part: "The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program ... established or maintained ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or

otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment...."

**7.** A 1984 Sixth Circuit case agreed with Judge Tang and held that ERISA does not preempt state law garnishment of welfare plan benefits. The Sixth Circuit did not, however, discuss whether such garnishment would be allowed if ERISA were to apply. See *Local Union 212, IBEW Vacation Trust Fund v. Local 212 IBEW Credit Union*, 735 F.2d 1010 (6th Cir.1984).

no federal question jurisdiction. *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841. The Supreme Court did not reach the merits of whether ERISA preempted state law with respect to alienation of welfare plan benefits.

In a subsequent Supreme Court case, a divided Court confronted the preemption question directly. *Mackey v. Lanier Collections Agency & Service, Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). In *Mackey*, a collection agency in Georgia obtained judgments against participants in an employee welfare benefit plan. To satisfy these judgments the collection agency sought to garnish the debtors' plan benefits. Georgia has a general garnishment statute that permits garnishment of assets to satisfy money judgments. The statute contains an exception that precludes garnishment of pension benefits. The Georgia Supreme Court had held that the Georgia statute's exception precluding garnishment of pension benefits was preempted by ERISA. The Supreme Court majority and the dissenters agreed that the exception precluding garnishment of pension benefits was preempted by ERISA because the exception made explicit reference to pension plans. They disagreed, however, over whether ERISA preempted the general Georgia garnishment statute as well. The majority relied on reasoning similar to that employed by Judge Tang in his *Franchise Tax Board* dissent to conclude that the general statute was not preempted, and that the garnishment could proceed under state law. Because the Court decided that the state law general garnishment statute was not preempted, the Court did not need to address what the outcome would have been under ERISA. In dicta, however, the majority suggested that the garnishment would have been proper under ERISA as well: "[W]hen Congress was adopting ERISA, it had before it a provision to bar the alienation or garnishment of ERISA plan benefits, and chose to impose that limitation only with respect to ERISA pension benefit plans, and *not* ERISA welfare benefit plans." *Id.* 108 S.Ct. at 2189 (emphasis in original).[8] The dissenters argued that the entire Georgia garnishment statute was preempted by ERISA. The dissenters did not, however, go on to analyze the outcome under ERISA.

In the same case, the majority explicitly cast doubt on the continuing validity of the Ninth Circuit's *Franchise Tax Board* decision. *Id.* 108 S.Ct. at 2186, n. 6 ("decisions from the Ninth Circuit have abandoned the position taken by the panel majority in *Franchise Tax Board*, and have adopted the interpretation of [ERISA's preemption provision] that Judge Tang expressed in dissent in that case."). In support of this proposition the Court cited *Misic v. Building Service Employees Health & Welfare Trust*, 789 F.2d 1374 (9th Cir.1986). In *Misic* beneficiaries of an ERISA welfare benefit plan trust assigned their rights to reimbursement from the trust to a dentist in return for his services. *Misic* held, in apparent contravention of *Franchise Tax Board*, that ERISA does not preclude such an assignment. The *Misic* court explained, however, that this holding was not inconsistent with *Franchise Tax Board*, because in *Misic* the rights assigned (health care benefits) were assigned in exchange for the very benefits they were designed to procure (dental work). *Misic* also appears to reaffirm the Ninth Circuit's *Franchise Tax Board* position by stating, "trust funds designed to provide accumulated money to a worker for future beneficial use may not be dissipated by alienation for other purposes." *Id.* at 1377, n. 2.

The precedential value of *Franchise Tax Board* is thus unclear. No other circuit has specifically considered the applicability of ERISA's anti-alienation provision to welfare benefit plans. In any event, the Supreme Court in *Mackey* has expressed the view, albeit in dicta, that the anti-alienation

---

**8.** This Court should respect considered Supreme Court dicta. See *Faheem–El v. Klincar*, 841 F.2d 712, 730–732 (7th Cir.1988) (concurring opinions following dicta in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

See also *United States v. Underwood*, 717 F.2d 482, 484–486 (9th Cir.1983) (en banc), certiorari denied, 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984).

provision of ERISA section 206(d)(1) does not apply to welfare benefit plans. This is consistent with the plain language of the statute. We endorse the Supreme Court's view and conclude that ERISA's anti-alienation provision does not invalidate the severance agreements at issue here. Since *Mackey* disapproved of the Ninth Circuit's construction of ERISA's anti-alienation provision and considered that construction abandoned by that Circuit, our adoption of *Mackey's* view of that provision does not create a conflict.

The district court did not err in finding that with advice of counsel Nichol "knowingly and intentionally and voluntarily waived [his long-term disability benefits]."

## IV. COSTS AND ATTORNEYS' FEES

■ Federal Rule of Civil Procedure 54(d) provides, "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs...." ERISA includes such an express provision:

> In any action under this title ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

In applying this provision, this Court has held that a district court's denial of attorney's fees and costs will only be reversed if the denial constitutes an abuse of discretion. *Marquardt v. North American Car Corp.,* 652 F.2d 715, 717 (7th Cir.1981).

Furthermore, that case recognized that failure to "award attorneys' fees and costs to ERISA defendants, even 'prevailing' defendants, would rarely constitute an abuse of discretion." *Id.* at 719.

*Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820 (7th Cir.1984), examined the development of a five-factor test for evaluating requests for attorney's fees and costs under Section 1132(g)(1) of ERISA,[9] and concluded that the five-factor test "is oriented toward the case where the plaintiff rather than the defendant prevails and seeks an award of attorney's fees." *Id.* at 829. As a result *Bittner* proposed an alternative test under which fees should be awarded to the prevailing party "unless the loser's position, while rejected by the court, had a solid basis—more than merely not frivolous, but less than meritorious." *Id.* at 830.[10]

Pullman argues that the *Bittner* test supplants the five-factor test where, as here, a prevailing defendant is requesting fees and costs. Nichol contends that *Bittner* merely proposes an additional standard for evaluating prevailing defendants' fee requests so that the five-factor test remains applicable to this case. Cases in this Circuit subsequent to *Bittner* seem to have adopted both systems. *Compare Chicago Painters and Decorators Pension Fund v. Karr Bros., Inc.,* 755 F.2d 1285 (7th Cir. 1985) (applying both the *Bittner* analysis and the five-factor test) *with Giardono v. Jones,* 867 F.2d 409 (7th Cir.1989) (applying the *Bittner* analysis only).

It is difficult to imagine a situation in which the application of one test rather

---

**9.** The five factors are: "(1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions." *Janowski v. Int'l Brotherhood of Teamsters,* 673 F.2d 931 (7th Cir.1982), vacated on other grounds, 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983). See also *Chicago Painters and Decorators Pension Fund v. Karr Bros., Inc.,* 755 F.2d 1285 (7th Cir.1985); *Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984); *Marquardt v. North American*

*Car Corp.,* 652 F.2d 715 (7th Cir.1981); *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446 (9th Cir.1980).

**10.** The *Bittner* test is derived from the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), which entitles a prevailing party to a reasonable attorney's fee, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." *Contra, Gray v. New England Telephone and Telegraph Co.,* 792 F.2d 251, 258–259 (1st Cir.1986) (rejecting the application of the Equal Access to Justice Act standard to ERISA cases).

than the other would alter our decision concerning the propriety of an award of costs or fees. Both tests are designed to award costs and fees to the prevailing party where there is reason to believe that the losing party engaged in litigation merely to harass its opponent. Furthermore, as we noted in *Marquardt*, a denial of fees will seldom constitute an abuse of discretion.

The district court relied solely on *Bittner* to conclude that Nichol's position did have a solid basis. This conclusion was not an abuse of discretion.[11] Nichol's complaint was sufficient to withstand Pullman's motion for summary judgment, and there is no evidence that Nichol's suit was designed merely to harass Pullman.

## V. CONCLUSION

For the reasons discussed above, the decisions of the district court are affirmed.

---

11. It was not revealed until the trial was in progress that Nichol had consulted with counsel before signing the severance agreements. Judge Marshall's opinion suggests that if he had known earlier that Nichol had consulted with counsel he might have decided that Nichol's claim did not have a solid basis. Counsel for Pullman argue that affirming the district court's fees and costs decision will, *in effect*, reward Nichol for his delay in disclosing that he con-

sulted with counsel before signing the severance agreements. Our holding that Judge Marshall did not abuse his discretion does not depend on the timing of the disclosure that Nichol consulted with counsel. With or without the evidence that he consulted with counsel, Nichol presented a claim that was sufficiently genuine to justify Judge Marshall's denial of Pullman's request for attorneys' fees and costs.