METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff,

v.

Rose Marie WHEATON, Defendant–Appellant,

and

Douglas Wheaton and Daniel Wheaton, Defendants–Appellees.

No. 94–1362.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1994.

Decided Dec. 14, 1994.

Michael W. Fleming (argued), Raasch, Fleming & Reidenbach, Milwaukee, WI, for defendant-appellant.

Joseph J. Welcenbach (argued), Welcenbach & Widmann, Richard W. Double, Double & Double, Milwaukee, WI, for defendants-appellees.

Before POSNER, Chief Judge, MANION, Circuit Judge, and ASPEN, District Judge.*

POSNER, Chief Judge.

This appeal presents questions of statutory interpretation in the context of a divorce decree that seeks to regulate the distribution of benefits under an ERISA welfare (as distinct from pension) plan. Frank Wheaton was a participant in the General Electric Employee Welfare Plan. One of the benefits provided by the plan was group life insurance. Wheaton and his wife divorced, and a stipulation incorporated in the divorce decree required both parties to "maintain ... the life insurance which is presently carried through his/her employer with the children of the parties named as sole and irrevocable primary beneficiaries until the youngest minor child reaches the age of majority or until such child has reached the age of nineteen (19) so long as the child is pursuing an accredited course of instruction leading to the acquisition of a high school diploma or equivalent." The Wheatons had two children, boys aged 15 and 17 on the date of the decree. Shortly after the decree took effect Wheaton remarried and named his new wife

---

* Hon. Marvin E. Aspen of the Northern District of Illinois.

as the exclusive beneficiary of his GE group life insurance. A year later he died. Both his widow and his boys (the older of whom was now 19, the younger 17) claimed the proceeds of the life insurance, some $60,000. Metropolitan Life Insurance Company, the claims administrator under the GE plan, interpleaded the contending claimants. The district judge gave judgment for the boys, and the widow appeals.

ERISA states that its provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). But there is an exception, added by the Retirement Equity Act of 1984, for "Qualified Domestic Relations Orders." § 1144(b)(7). Such an order is defined as a domestic relations order that, so far as relevant here, "assigns to an alternate payee the right to ... receive all or a portion of the benefits payable with respect to a participant under a plan." § 1056(d)(3)(B)(i). To qualify, the order must "clearly specif[y]" three things: the mailing address of each alternate payee, "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined," and "each plan to which such order applies." §§ 1056(d)(3)(C)(i), (ii), (iv).

The section from which we have been quoting, 29 U.S.C. § 1056(d), where qualified domestic relations orders are defined and their requirements specified, begins with a declaration that "Each *pension* plan shall provide that benefits provided under the plan may not be assigned or alienated." § 1056(d)(1) (emphasis added). Later the section states that the subsection we just quoted "shall not apply if the order is determined to be a qualified domestic relations order. Each *pension* plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." § 1056(d)(3)(A) (emphasis added). And the section was added to ERISA, as we have said, by the *Retirement* Equity Act, although the Act's definition of qualified domestic relations orders is not, in so many words anyway, limited to pension plans. The widow's first argument is that the exception

for qualified domestic relations orders to the nonassignability and inalienability of an interest in an ERISA plan is limited to pension plans, and here we have a welfare plan.

■ There is a logically prior issue— whether if the Retirement Equity Act is inapplicable to welfare plans, as the widow contends, a provision in a divorce decree specifying the beneficiary of an employee's interest in an ERISA welfare plan simply is outside the scope of ERISA's preemption clause. We think it important to flag the issue; though neither party has raised it, it is sure to recur.

The draftsmen of the Retirement Equity Act took pains to forbid expressly, though with some exceptions, the alienation or assignment of pension plan benefits, including alienation or assignment by a divorce decree. This would not have been necessary had it been clear that ERISA's general preemption clause (26 U.S.C. § 1144(a)) already prohibited such means of alienation. But it was not clear that the general clause, in prohibiting the states from regulating pension plans, necessarily forbade them to specify the allocation of plan benefits in the event of a divorce. Preemption so encompassing would invade the domestic relations jurisdiction of the states, a matter traditionally of state prerogative. *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 583, 99 S.Ct. 802, 808, 809, 59 L.Ed.2d 1 (1979); *Lloyd v. Loeffler*, 694 F.2d 489, 491–92 (7th Cir.1982). If the general provision on pre-emption does not reach that far, then even if the second Mrs. Wheaton were correct that the Retirement Equity Act is totally inapplicable to welfare plans, she would lose.

■ Before that Act was passed, we had held that ERISA did not preempt state domestic relations law. *Savings & Profit Sharing Fund v. Gago*, 717 F.2d 1038 (7th Cir. 1983). We were not alone in this view, see *Operating Engineers' Local # 428 Pension Trust Fund v. Zamborsky*, 650 F.2d 196 (9th Cir.1981), but there were cases opposed (see discussion in *Fox Valley & Vicinity Construction Workers Pension Fund v. Brown*, 897 F.2d 275, 278–79 (7th Cir.1990) (en banc); *Herberger v. Shanbaum*, 897 F.2d 801, 804 (5th Cir.1990); S.Rep. No. 575, 98th Cong.,

2d Sess. 18–19 (1984) U.S.Code Cong. & Admin.News 1984 at 2547, 2564–2565), and the Retirement Equity Act was Congress's effort to repair the split. See *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 838–39, 108 S.Ct. 2182, 2190–91, 100 L.Ed.2d 836 (1988). Obviously the specific holding of *Gago* did not survive the passage of the Act, at least so far as domestic relations orders concerning pension benefits are concerned; unless those orders comply with the requirements for a qualified domestic relation order, they are preempted. But if the Act has no application to welfare plans, maybe it did not disturb the principle of *Gago* with regard to domestic relations orders limited to such plans, as the one in this case was. *Stackhouse v. Russell,* 447 N.W.2d 124 (Ia.1989), so holds, but without mention of the Retirement Equity Act.

The widow is trying to walk a fine line. The anti-alienation provision added by the Retirement Equity Act is, by its terms, applicable only to pension plans; and every court to consider the issue has limited its scope accordingly. *Nichol v. Pullman Standard, Inc.,* 889 F.2d 115, 119–21 (7th Cir.1989); *Anweiler v. American Electric Power Service Corp.,* 3 F.3d 986, 994 (7th Cir.1993); *United States v. International Brotherhood of Teamsters,* 941 F.2d 1292, 1298 (2d Cir. 1991); *Misic v. Building Service Employees Health & Welfare Trust,* 789 F.2d 1374, 1376–77 (9th Cir.1986) (per curiam). She is relying on the *general* preemption provision of ERISA to knock out all but qualified domestic relations orders and seeking to confine the exception for qualified domestic relations orders to those orders that affect interests in pension plans, in order to prevent the divorce stipulation in the present case from being enforced. We think this attempt must fail even if (an issue we need not decide, and ought not since it was not raised by the parties) the general preemption provision has, contrary to cases like *Gago* that preceded the Retirement Equity Act, the broad scope that she ascribes to that provision.

The primary concern of the draftsmen of the Retirement Equity Act was, it is true, with retirement, and hence with the pension provisions of ERISA. (In addition to the conspicuous textual clues noted earlier, see S.Rep. No. 575, *supra.*) Nevertheless the definition of qualified domestic relations orders is not limited to orders that affect pension plans. It applies to all plan participants. What is more, the exemption of such orders from the preemptive sweep of ERISA appears not in the section of the statute that defines those orders and prescribes the conditions for effectuating and enforcing them (29 U.S.C. § 1056), but rather in the section that contains the general pre-emption provision (§ 1144), and *that* provision, of course, applies to welfare and pension plans alike. True, the subsection that exempts qualified domestic relations orders (§ 1144(b)(7)) defines what it is that is being exempted by incorporating the definition of qualified domestic relations orders that appears in the section creating those orders (§ 1056); but that definition, too, is in terms of all plans rather than just pension plans.

We are not slaves to literalism, but we cannot understand why, if a qualified domestic relations order can override the designation of beneficiary in a pension plan, as Congress in the Retirement Equity Act decided that it can, Congress would not have allowed such an order to override the designation of beneficiary in a welfare plan. The draftsmen of the Retirement Equity Act were concerned with the financial security of the spouses and other survivors of employees who died enrolled in ERISA plans. S.Rep. No. 575, *supra,* at 12, U.S.Code Cong. & Admin.News 1984 at 2558; *Hurwitz v. Sher,* 982 F.2d 778, 781 (2d Cir.1992). That does not by itself point us to a unique solution in the present case, ·where we have a spouse (albeit a very recent one) on one side and children on the other. But it does suggest that to distinguish between pension benefits and life insurance proceeds so far as the validity of domestic relations orders is concerned would be arbitrary. The employee's life insurance will often be as important to the survivors as his pension benefits. And since the alienation of pension benefits is more momentous to the average pensioner, because it may take effect before his death, than changing the pocket in which the proceeds of his life insurance will end up after his death, it would be odd if it were easier to

alienate the former type of benefit than to change the recipient of the latter type. Bearing in mind that anti-alienation provisions in trusts are "spendthrift" provisions, intended to place the trust's assets beyond the reach of the beneficiary's creditors, we can imagine an argument that it is *more* important to shield pension benefits than life insurance, since the pensioner needs the former to live, or at least to live well. And yet the widow's argument in this case implies that it should be more difficult to change the beneficiary of life-insurance proceeds than the recipient of a pension, by denying that a qualified domestic relations order can override the designation of beneficiary in a welfare plan.

We conclude that the literal reading of ERISA as amended by the Retirement Equity Act, a reading that establishes an exception to preemption for qualified domestic relations orders pertaining to all ERISA plans, not just pension plans, makes more practical sense than a flexible reading that gives weight to the history of the provision and to the fact that the provisions that surround the definition of qualified domestic relations orders, including the anti-alienation provision, are limited to pension plans, though the definition is not. We shall go with the literal reading, and so turn now to the widow's back-up argument, which is that the divorce stipulation does not contain all the information required by the statute for a qualified domestic relations order. It does not give the boys' address, name the plans to which it applies, or specify the percentage division between the designated beneficiaries (the Wheatons' children). All these things must be "clearly specif[ied]" for a domestic relations order (which the stipulation, incorporated as it was in the divorce decree, plainly is) to qualify for the statutory exception. The statutory language is explicit and emphatic. The purpose is to reduce the expense of ERISA plans by sparing plan administrators the grief they experience when because of uncertainty concerning the identity of the beneficiary they pay the wrong person, or arguably the wrong person, and are sued by a rival claimant. *Id.* at 782; *Carland v. Metropolitan Life Ins. Co.,* 935 F.2d 1114,

1120 (10th Cir.1991); cf. *Hartmann v. Prudential Ins. Co.,* 9 F.3d 1207 (7th Cir.1993).

The matter of addresses is no problem. At the time of the decree the Wheaton children were—children. They lived with their parents (who were given joint custody by the decree), so the children's address was the parents' addresses, and those addresses were stated in the decree. The failure to name the plan is a little more troublesome. But the stipulation does specify "the life insurance which is presently carried through his/her employer," and this designation permits the identification of the plans to which the decree applies without significant ambiguity. Any life insurance provided under an employer's policy at the time of the stipulation is covered.

The difficult question involves the requirement that the division of the proceeds among the alternate payees be clearly specified, either by specific percentage or by a formula from which the percentages can be calculated. When Mr. Wheaton died, his elder son had already graduated from high school. Could the younger son argue that he should get the entire $60,000, since the purpose of the provision requiring the parents to designate their children as the sole beneficiaries of their life insurance seems to have been to make sure the children were adequately supported through high school, after which they could go to work and support themselves, or attend college with the aid of scholarships or loans? No doubt the more plausible interpretation is that the boys are to split the proceeds of the insurance 50–50. But the stipulation does not say this. Therefore, the widow argues, it does not "clearly specify" the division among the alternate payees.

There is force to this argument, but we believe that on balance it is unsound. The requirement of clear specification is designed to spare the plan administrator from litigation-fomenting ambiguities as to who the beneficiaries designated by the divorce decree are. We do not believe that Metropolitan Life Insurance Company faced any such risk here. If it had, we imagine we would have heard from it, but having interpleaded the contestants it ceased to play any role in

the litigation and has not filed a brief with us. Granted, it would not have been safe in writing a check to the boys jointly, letting them fight over the division in the unlikely event that they are not content with an even division, any more than it would have been completely safe in filing an interpleader suit (like the present one, but naming the boys as the contestants rather than the boys versus the widow) and depositing the proceeds with the clerk of court. These may not be safe harbors—refusing to pay a claim unless the claimant establishes his entitlement in litigation could be thought the equivalent of refusing to pay the claim—although the case law on the question is sparse. *Arcuri v. Great American Ins. Co.,* 176 W.Va. 211, 342 S.E.2d 177, 184 (1986); cf. *Little Rock Road Machinery Co. v. Light,* 240 Ark. 1012, 403 S.W.2d 726, 728 (1966).

 But the insurance company would be safe in cutting a check for 50 percent of the proceeds to each boy, because it is clear that this is how the divorce decree allocates the proceeds. The provisions in a life insurance contract that relate to beneficiaries are construed in accordance with the law of wills, *American Foundation Life Ins. Co. v. Wampler,* 254 Ark. 983, 497 S.W.2d 656, 658 (1973); 5 *Couch on Insurance* § 28:7, p. 14 (2d ed. 1984); the stipulation regarding Mr. Wheaton's life insurance was in effect a provision of an insurance contract regarding beneficiaries; and the Wisconsin law of wills and estates presumes equal distribution in cases where no other distribution is specified in the will itself or in an applicable statute. See Wis.Stat.Ann. §§ 702.15(2), 852.01(1)(b), 853.55, art. 2.1; *In re Trust of Bowler,* 56 Wis.2d 171, 201 N.W.2d 573, 576 (1972); *In re Phillips' Estate,* 236 Wis. 268, 294 N.W. 824, 826 (1940); *Savings & Profit Sharing Fund v. Gago, supra,* 717 F.2d at 1044. The principle is again a general one, not an idiosyncrasy of Wisconsin law. *Loring v. Palmer,* 118 U.S. 321, 341, 6 S.Ct. 1073, 1080, 30 L.Ed. 211 (1886); *In re Gottfried's Estate,* 41 Misc.2d 575, 245 N.Y.S.2d 948, 951 (Surr.Ct.1963); William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 36.5, p. 554 (rev. ed. 1961 & Supp.1993).

So the plan administrator was not forced to run a significant risk by the failure of the stipulation to specify the division between the boys. The domestic relations order was therefore specific enough to serve ERISA's purposes. To require more specificity would defeat the purpose of the provision creating an exception to inalienability for qualified domestic relations orders, at least in the present case, and for a purely theoretical gain in certainty. It is asking too much of domestic relations lawyers and judges to expect them to dot every *i* and cross every *t* in formulating divorce decrees that have ERISA implications. Ideally, every domestic relations lawyer should be conversant with ERISA, but it is unrealistic to expect all of them to be. We do not think Congress meant to ask the impossible, not the literally, but the humanly, impossible, or to make a suit for legal malpractice the sole recourse of an ERISA beneficiary harmed by a lawyer's failure to navigate the treacherous shoals with which the modern state-federal law of employee benefits abounds.

AFFIRMED.

MANION, Circuit Judge, concurring in the judgment.

I agree with the court's judgment that Daniel and Douglas Wheaton should receive their father's life insurance proceeds pursuant to the state divorce decree. However, this need not be a complicated analysis resolving perceived arbitrary distinctions between the assignability of pension plans versus welfare plan benefits via a QDRO. Nor, for that matter, is it even necessary to determine whether this divorce decree *is* a QDRO. Instead, if an assignment of welfare plan benefits is not governed by ERISA at all, the inquiry ends.

The court apparently assumes as a necessary premise to its analysis that the general preemption provision of ERISA, 29 U.S.C. § 1144(a), prohibits a state divorce decree from redesignating the beneficiary of welfare plan benefits. This assumption would be viable were we writing on a clean slate. However, the Supreme Court in *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836

(1988), examined 29 U.S.C. §§ 1056(d) and 1144(a) and determined that an assignment of welfare plan benefits escapes the long arm of ERISA. There was never any question in *Mackey* whether Congress had barred the assignment of benefits under an employee welfare plan; as noted by the Supreme Court, Congress extended anti-alienation protection to the benefits of pension plans only. *Id.* at 836, 108 S.Ct. at 2189.

Instead, the chief concern in *Mackey* was whether ERISA preempted the application of a state's general garnishment procedure to ERISA welfare plan benefits (in that case, accrued vacation benefits). The trustees of the plan raised an argument similar to that presumed by this court, that ERISA's preemption provision trumps state laws that attempt to assign (technically, garnish, but the effect is the same) welfare plan benefits. The Supreme Court rejected this argument. First, the Court observed that ERISA's preemption provision "deals with state laws as they relate to *plans*," *id.* at 836, 108 S.Ct. at 2189 (emphasis in original), whereas the anti-alienation provision applies only to *benefits,* specifically, those of pension and not welfare plans. *Id.* at 836, 108 S.Ct. at 2189; *see also Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 39 F.3d 1078, 1085–86 (10th Cir. 1994) (en banc) (same). This was an important distinction, for to read the preemption provision as barring state laws that affect both plan benefits and plans would essentially render the anti-alienation clause of § 1056(d)(1) redundant. *Id.* 486 U.S. at 837, 108 S.Ct. at 2189; *see also Sav. & Profit Sharing Fund of Sears Emp. v. Gago,* 717 F.2d 1038, 1040–41 n. 5 (7th Cir.1983) (same). Second, the Court noted that when Congress adopted ERISA it had before it a provision to bar the alienation of both pension and welfare plans, but ultimately chose only to bar the alienation of the former. As noted by the Court:

> In a comprehensive regulatory scheme like ERISA, such omissions are significant ones. Once Congress was sufficiently aware of the prospect that ERISA plan benefits could be attached and/or garnished—as evidenced by its adoption of [§ 1056(d)(1) ]—Congress' failure to expressly bar the state-law alienation of wel-

fare plan benefits meant that Congress' decision to remain silent concerning [alienation] of ERISA welfare plan benefits "acknowledged and accepted the practice, rather than prohibiting it."

*Id.* 486 U.S. at 837, 108 S.Ct. at 2189 (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 516, 101 S.Ct. 1895, 1902–03, 68 L.Ed.2d 402 (1981)). From this, the Court concluded that "Congress did not intend to preclude state-law attachment of ERISA welfare plan benefits." *Id.* 486 U.S. at 838, 108 S.Ct. at 2190.

Moreover, the Court addressed the trustees' back-up argument (also alluded to by this court). The trustees claimed that the 1984 Retirement Equity Act amendments to ERISA demonstrated that Congress thought that ERISA's preemption provision, as originally enacted, generally preempted all state law assignments and alienations, pension and welfare plans alike. The Court, however, did not accept this proposed theory that was supposedly the driving force behind the 1984 amendments:

> There is, however, another plausible construction of Congress' action in 1984, namely, that Congress thought that some courts had erroneously construed [§ 1144(a) ] as pre-empting such orders. In this view, the 1984 amendment served the purpose of correcting the error thus clarifying the original meaning of the section. Moreover, even if the United States is correct, and Congress in 1984 thought that [§ 1144(a) ] as originally enacted preempted domestic relations orders directed at ERISA plans—and other state-law attachments and garnishments as well—the opinion of this later Congress as to the meaning of a law enacted 10 years earlier does not control the issue.

*Id.* 486 U.S. at 839, 108 S.Ct. at 2190–91 (footnotes omitted) (citations omitted).

Clearly, then, ERISA preemption does not reach as far as the assignment of welfare plan benefits. This is made all the more important when we consider what is at stake here. Rose Marie Wheaton is launching this appeal in an attempt to undermine a provision of a state divorce decree. However, the

Supreme Court has made clear that matters of state family law traditionally lay outside the realm of federal review. *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979). The only exception is where the state order frustrates clearly defined federal interests; only then does a federal court have limited review under the Supremacy Clause to determine if Congress has positively intended to preempt state law. *Id.* But as made clear by *Mackey*, Congress has not barred the assignment of welfare plan benefits, so there is nothing in this state law divorce decree designating the beneficiaries of Frank Wheaton's life insurance proceeds that conflicts with federal law as codified in ERISA. Therefore, I would hold that this case does not present a substantial federal question under the Supremacy Clause, and should be dismissed. *Cf. Hisquierdo*, 439 U.S. at 581, 99 S.Ct. at 808 ("Federal courts repeatedly have declined to assert jurisdiction over divorces that presented no federal question."). With that, I would dismiss this case, leaving the proceeds of this life insurance policy to the Wheaton brothers according to the terms of the divorce decree.