Darlene I. TOLSTAD, Plaintiff and Appellee,

v.

Corrine J. TOLSTAD, Defendant and Appellant.

Civ. No. 940203.

Supreme Court of North Dakota.

Feb. 8, 1995.

Brenda J. Selinger (argued), Greenwood, Greenwood, Greenwood, Selinger & Ramsey, Dickinson, for plaintiff and appellee.

Carol Ronning Kapsner (argued), Kapsner & Kapsner, Bismarck, for defendant and appellant. Appearance by appellant Corrine J. Tolstad.

NEUMANN, Justice.

Corrine Tolstad appeals from a district court summary judgment awarding the proceeds of Ray Tolstad's group insurance policy to Darlene Tolstad. We affirm.

Ray and Darlene were divorced on November 18, 1988. Their stipulated property settlement was incorporated into the divorce decree, including the following provision:

"So long as [Ray's] employer furnishes a life insurance policy on the life of [Ray], that [Ray] shall continue to name [Darlene] as his primary beneficiary...."

Ray was employed at BNI Coal, and at the time of the divorce Darlene was named the primary beneficiary on his group insurance plan. The group policy, underwritten by Standard Insurance Company, included $40,000 of life insurance coverage and $40,000 of accidental death and dismemberment [AD & D] coverage. Ray subsequently married Corrine, and on September 28, 1990, Ray signed a beneficiary designation form naming Corrine primary beneficiary under his group insurance plan. Ray died in a horseback riding accident on May 12, 1993.

After Ray's death, Darlene notified Standard that she was claiming policy benefits under the divorce decree, and BNI submitted to Standard the beneficiary designation form naming Corrine. Darlene and Corrine subsequently executed a release permitting Standard to issue two checks, each for $40,000 plus interest, which were deposited into court pending resolution of this dispute. Darlene then brought this action, and Darlene and Corrine each moved for summary judgment claiming the entire $80,000 plus interest. The court granted summary judgment awarding the entire proceeds to Darlene, and Corrine appealed.

Two issues are dispositive of the appeal:

I. Is enforcement of the divorce decree preempted by the Employee Retirement Income Security Act [ERISA]?

II. If the divorce decree is enforceable, does it cover the death benefit payable under the AD & D coverage?

## I. ERISA

ERISA, codified at 29 U.S.C. § 1001 *et seq.*, comprehensively regulates employee benefit and retirement plans. Under 29 U.S.C. § 1144(a), ERISA preempts state laws which "relate to" any employee benefit plan. "State law" is defined to include "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1). State statutes or judgments affecting beneficiary designations under an employee benefit plan have been universally construed to "relate to" the plan, and therefore are subject to the ERISA preemption provisions. *See, e.g., Brandon v. Travelers Insurance Co.*, 18 F.3d 1321, 1325 (5th Cir.1994); *Brown v. Connecticut General Life Insurance Co.*, 934 F.2d 1193, 1195 (11th Cir.1991); *McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir.1990).

ERISA was amended in 1984 by the Retirement Equity Act. One of the provisions of the 1984 amendment created an exception to ERISA's preemption provisions for a qualified domestic relations order [QDRO]. *See* 29 U.S.C. § 1144(b)(7). A QDRO is defined as any judgment, decree, or order, made under a state's domestic relations law, which relates to child support, spousal support, or marital property rights, and "which creates or recognizes the existence of an alternate payee's right to ... receive all or a portion of

the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B).

■ ERISA distinguishes between "employee welfare benefit plans" and "employee pension benefit plans." 29 U.S.C. § 1002(1) and (2). Group insurance paying death benefits falls within the definition of "employee welfare benefit plan." *See* 29 U.S.C. § 1002(1). Corrine argues that the provisions exempting QDROs from preemption by ERISA apply only to pension plans, not welfare plans, and that the divorce decree in this case therefore is not exempt from federal preemption by ERISA. If the decree is not exempt, it is preempted by ERISA and unenforceable, and the beneficiary designation naming Corrine would control disposition of the group plan benefits.

■ In support of her argument, Corrine relies exclusively upon *Metropolitan Life Insurance Co. v. Person,* 805 F.Supp. 1411 (E.D.Mich.1992), which holds that the exemption for QDROs applies only to employee pension benefits, not to employee welfare benefits such as group life insurance. However, the federal appellate courts which have addressed the issue have held that the QDRO exemption applies to welfare benefit plans, including designation of beneficiaries for life insurance, as well as pension benefit plans. *Metropolitan Life Insurance Co. v. Wheaton,* 42 F.3d 1080 (7th Cir.1994); *Carland v. Metropolitan Life Insurance Co.,* 935 F.2d 1114 (10th Cir.), *cert. denied,* 502 U.S. 1020, 112 S.Ct. 670, 116 L.Ed.2d 761 (1991).

In *Carland, supra,* 935 F.2d at 1119–1120, the court concluded:

"Because the reference in the preemption clause to section 1056(d)(3)(B)(i) does not restrict application of the statutory preemption exception to pension benefit plans, however, we interpret the exception to apply to all qualifying domestic relation orders whether they involve a pension or welfare benefit plan. Taken together, sections 1144(b)(7) and 1056(d)(3)(B)(i) of the statute exempt divorce decrees meeting the statutory requirements from ERISA preemption. The general goals of ERISA are served by this interpretation of the

preemption exception because a divorce decree meeting the requirements contained in section 1056(d) provides all the necessary information to determine the identity of a beneficiary without creating unreasonable administrative burdens for the plan administrator."

Similarly, in *Wheaton,* 42 F.3d at 1083–84, the court held:

"The primary concern of the draftsmen of the Retirement Equity Act was, it is true, with retirement, and hence with the pension provisions of ERISA.... Nevertheless the definition of qualified domestic relations orders is not limited to orders that affect pension plans. It applies to all plan participants. What is more, the exemption of such orders from the preemptive sweep of ERISA appears not in the section of the statute that defines those orders and prescribes the conditions for effectuating and enforcing them ( [29] U.S.C. sec. 1056), but rather in the section that contains the general pre-emption provision (sec. 1144), and that provision, of course, applies to welfare and pension plans alike. True, the subsection that exempts qualified domestic relations orders (sec. 1144(b)(7)) defines what it is that is being exempted by incorporating the definition of qualified domestic relations orders that appears in the section creating those orders (sec. 1056); but that definition, too, is in terms of all plans rather than just pension plans.

"We are not slaves to literalism, but we cannot understand why, if a qualified domestic relations order can override the designation of beneficiary in a pension plan, as Congress in the Retirement Equity Act decided that it can, Congress would not have allowed such an order to override the designation of beneficiary in a welfare plan....

"[T]o distinguish between pension benefits and life insurance proceeds so far as the validity of domestic relations orders is concerned would be arbitrary. The employee's life insurance will often be as important to the survivors as his pension benefits. And since the alienation of pension benefits is more momentous to the average

pensioner, because it may take effect before his death, than changing the pocket in which the proceeds of his life insurance will end up after his death, it would be odd if it were easier to alienate the former type of benefit than to change the recipient of the latter type. Bearing in mind that anti-alienation provisions in trusts are 'spendthrift' provisions, intended to place the trust's assets beyond the reach of the beneficiary's creditors, we can imagine an argument that it is more important to shield pension benefits than life insurance, since the pensioner needs the former to live, or at least to live well. And yet the widow's argument in this case implies that it should be more difficult to change the beneficiary of life-insurance proceeds than the recipient of a pension, by denying that a qualified domestic relations order can override the designation of beneficiary in a welfare plan.

"We conclude that the literal reading of ERISA as amended by the Retirement Equity Act, a reading that establishes an exception to preemption for qualified domestic relations orders pertaining to all ERISA plans, not just pension plans, makes more practical sense...."

We agree with the federal circuit court cases, and we conclude that the QDRO exemption from preemption applies to a divorce decree that specifies a beneficiary designation for an employee's group life insurance policy.

■ Corrine asserts that, even if the QDRO exemption applies to employee insurance plans, the divorce decree in this case is not a QDRO. The relevant requirements for a QDRO are enumerated in 29 U.S.C. § 1056(d)(3)(C):

"(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

"(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

"(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the

manner in which such amount or percentage is to be determined,

"(iii) the number of payments or period to which such order applies, and

"(iv) each plan to which such order applies."

Corrine asserts that the decree in this case does not clearly specify the last known mailing address of Darlene and the plan to which the order applies.

In determining whether the decree is sufficiently specific, we look for guidance to the legislative history of the QDRO provisions and to the decisions in *Wheaton* and *Carland*, which involved facts markedly similar to this case.

The legislative history of the 1984 QDRO amendments indicates the requirement that the order include the alternate payee's mailing address is to be flexibly applied:

"The committee intends that an order will not be treated as failing to be a qualified order merely because the order does not specify the current mailing address of the participant and alternate payee if the plan administrator has reason to know that address independently of the order. For example, if the plan administrator is aware that the alternate payee is also a participant under the plan and the plan records include a current address for each participant, the plan administrator may not treat the order as failing to qualify."

S.Rep. No. 575, 98th Cong., 2d Sess. 20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566; *see also* Howard A. Massler, *Qualified Domestic Relations Orders: A Statutory Analysis*, 19 Seton Hall L.Rev. 224, 227 n. 15 (1989); Craig Westbrook, 9 U.Ark.Little Rock L.J. 487, 490 (1986/1987). In *Carland, supra*, 935 F.2d at 1120, it was held sufficient when the plan administrator was aware of the names and addresses of the alternate payee's attorneys. In *Wheaton, supra*, 42 F.3d at 1084, the court inferred that the alternate payees, the plan participant's children, lived with their parents, and therefore knowledge of the parents' addresses by the plan administrator was sufficient to comply with the address requirement.

From the legislative history and the decisions in *Carland* and *Wheaton*, it is clear that

the purpose of the address requirement is to aid plan administrators in identifying and locating alternate payees under a QDRO. Accordingly, the statutory requirements are satisfied when the plan administrator has knowledge of the identity of the alternate payee and an address to contact her. *See* Massler, *supra,* 19 Seton Hall L.Rev. at 227.

■ The record in this case indicates the plan administrator and Standard were aware of Darlene's identity and her claim to Ray's death benefit. A letter in the record from Standard to Darlene's attorney demonstrates that Standard was able to contact Darlene. This satisfies the mailing address requirement of 29 U.S.C. § 1056(d)(3)(C)(i).

■ Corrine also argues that the divorce decree did not clearly specify the plan to which it applied. Corrine argues that, to comply with 29 U.S.C. § 1056(d)(3)(C)(iv), the decree must specify by name or policy number the exact plan to which it applies.

The provision in the divorce decree is very similar to the decree involved in *Wheaton.* The decree here provided:

> "So long as [Ray's] employer furnishes a life insurance policy on the life of [Ray], that [Ray] shall continue to name [Darlene] as his primary beneficiary...."

The decree in *Wheaton* required the parties to "maintain ... the life insurance which is presently carried through his/her employer with the children of the parties named as sole and irrevocable primary beneficiaries...." *Wheaton, supra,* 42 F.3d at 1081. The *Wheaton* court held that the plan was adequately identified:

> "[T]he stipulation does specify 'the life insurance which is presently carried through his/her employer,' and this designation permits the identification of the plans to which the decree applies without significant ambiguity. Any life insurance provided under an employer's policy at the time of the stipulation is covered."

*Wheaton, supra,* 42 F.3d at 1084. The court went on to note:

> "The domestic relations order was therefore specific enough to serve ERISA's purposes. To require more specificity would defeat the purpose of the provision creat-

ing an exception to inalienability for qualified domestic relations orders, at least in the present case, and for a purely theoretical gain in certainty."

*Wheaton, supra,* 42 F.3d at 1085.

Similarly, there is no significant ambiguity in identifying the plan to which the decree in this case applied. Ray had only one employer and only one insurance plan furnished by that employer. We conclude that the decree satisfied the requirements of 29 U.S.C. § 1056(d)(3)(C) and was a valid QDRO.

## II. AD & D COVERAGE

Corrine asserts that, even if the decree is a valid QDRO, it applies only to the life insurance coverage under Ray's group plan with BNI, and not to the AD & D coverage. Corrine's argument is based upon her assertion that life and AD & D are two separate types of insurance, governed by different policy provisions and law, and that the requirement that Ray name Darlene as beneficiary of his life insurance policy did not extend to AD & D benefits under the BNI group policy.

Corrine cites no authority for her assertion that life insurance and AD & D are separate and distinct forms of insurance, and that one does not include the other. We recognize the insurance statutes of many states contain separate provisions for each, and many cases from other jurisdictions distinguish between life and AD & D policies. However, those cases typically focus upon application of specific state statutes or policy provisions governing conversion rights. *See, e.g., Missig v. Prudential Insurance Co.,* 575 F.Supp. 1185, 1186–1187 (E.D.Mich.1983); *Rainey v. Guardian Life Insurance Co.,* 168 Ga.App. 577, 309 S.E.2d 649, 650 (1983); *Daigle v. Travelers Insurance Co.,* 421 So.2d 302, 304 (La.Ct.App.1982); *Sanders v. Oregon Pacific States Insurance Co.,* 314 Or. 521, 840 P.2d 87, 89, 91 (1992); *Equitable Life Assurance Co. v. Odle,* 547 S.W.2d 939, 940–941 (Tenn. 1977); *Life Insurance Co. of North America v. Klingler,* 730 S.W.2d 32, 34–35 (Tex.Ct. App.1987). Similarly, where a decedent had two completely separate policies for life insurance and AD & D, the court held that

cashing a check for benefits under the life insurance policy did not constitute a release of claims under the AD & D policy. *Stewart v. Group Health & Life Insurance Co.*, 555 S.W.2d 531, 533 (Tex.Civ.App.1977).

Many of the cases from other jurisdictions rely upon statutory schemes which have differing provisions for life and AD & D policies. Although not cited by the parties, our statutory scheme also provides separate chapters governing life insurance and accidental death insurance. *See* Chs. 26.1–33 and 26.1–36, N.D.C.C. Our statutes, however, make a critical distinction between separate policies and separate coverages in one policy. Section 26.1–36–01, N.D.C.C., which outlines the scope of the chapter entitled "Accident and Health Insurance," provides:

> "*26.1–36–01. Scope.* No section of this chapter applies to or affects ... (4) life insurance, endowment or annuity contracts, or contracts supplemental thereto which contain only such provisions relating to accident and sickness insurance as (a) provide additional benefits in case of death or dismemberment or loss of sight by accident...."

This provision clarifies that when there is a single insurance contract for life insurance, which also contains supplemental coverage for accidental death or dismemberment, the policy is not governed by the chapter on accident and health insurance.

The Supreme Court of Tennessee, construing its statutory scheme, also concluded that a policy which includes supplemental AD & D coverage is life insurance:

> "As we construe the Code definition of life insurance, the basic requirement is that it primarily insure human lives; that secondarily it retains its character as life insurance even though other coverage is included, such as the granting of annuities, endowment benefits, accidental death benefits and permanent disability benefits. We reject an interpretation that any of these additional features, alone or in any combination forming the basic coverage of an insurance policy are to be characterized as 'life insurance' under the Code, unless the basic coverage is insurance on a human life, not limited to accidental death."

*Equitable Life Assurance Co. v. Odle, supra,* 547 S.W.2d at 940–941.

■ If a single policy provides primary life insurance coverage and supplemental coverage for accidental death and dismemberment, under our statutory scheme the entire policy constitutes life insurance and is governed by the chapter regulating life insurance. Although that conclusion is relevant to our determination whether this decree applies to the AD & D coverage, it does not end our inquiry.

■ The primary issue in this case is the effect of the divorce decree. In a very similar case, *Bankers Life and Casualty Co. v. Slater,* 437 N.W.2d 109 (Minn.Ct.App.1989), the court held that a divorce decree requiring the ex-spouse to continue his "life insurance" for the benefit of his child applied to an AD & D policy. The court stressed that the crucial question was whether the decree was intended to cover the AD & D policy:

> "While technically correct, appellant's arguments are not relevant to the issue presented here, which is whether the Bankers Life policy is 'life insurance' within the narrow confines of the 1982 divorce decree. Understood in its common meaning, the term 'life insurance' as used in the 1982 divorce decree includes the Bankers Life policy because it was payable upon Slater's death. The fact that the Bankers Life policy was payable only upon death by certain causes is irrelevant to its classification as 'life insurance' under the 1982 divorce decree."

*Slater, supra,* 437 N.W.2d at 112.

The crucial question here is whether the divorce decree applies to the supplemental AD & D coverage. By its terms, the decree required that Ray "continue to name [Darlene] as his primary beneficiary" for so long as BNI "furnishes a life insurance policy" on Ray. Ray was required to name Darlene as beneficiary on the "policy" furnished by his employer. Ray's employer, BNI, provided a single policy which included life insurance and supplemental AD & D coverage. Furthermore, the BNI group policy, by its terms, did not envision the naming of separate beneficiaries under the life and AD & D coverage. The relevant policy provisions state:

"BENEFICIARY or BENEFICIARIES mean the person or persons you name to receive the death benefits under the GROUP POLICY if you die. . . .

\*        \*        \*        \*        \*        \*

"Death benefits will be paid to your surviving BENEFICIARY or BENEFICIARIES in the highest class, with the classes ranking in the following order: primary, followed by first contingent, second contingent, etc. Two or more surviving BENEFICIARIES in the same class will share equally, unless you specify their respective shares."

These policy provisions contemplate that a single beneficiary, or class of beneficiaries, is to receive the entire "death benefits," including accidental death benefits. There is no provision for naming separate beneficiaries to receive different components of the "death benefits." In addition, the beneficiary designation forms provided to Ray provided a single space to name a beneficiary for "Life and AD & D Insurance." If Ray had complied with the divorce decree and retained Darlene as his primary beneficiary under his employer-provided life insurance policy, Darlene would be entitled by the terms of the policy to the AD & D death benefit. We conclude that Darlene was entitled to the AD & D benefits pursuant to the divorce decree.

 Darlene asserts that Corrine's appeal is frivolous and seeks damages and costs, including attorneys fees. An appeal is frivolous under Rule 38, N.D.R.App.P., if it is flagrantly groundless, devoid of merit, or demonstrates persistence in the course of litigation which evidences bad faith. *In re Will of Rub*, 510 N.W.2d 583, 584 (N.D.1994). Corrine's appeal is not frivolous.

The judgment of the district court is affirmed.

VANDE WALLE, C.J., and LEVINE, MESCHKE and SANDSTROM, JJ., concur.