*13-4725-cv*
*Yale-New Haven Hosp. v. Nicholls*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2014

No. 13-4725-cv

YALE-NEW HAVEN HOSPITAL,
*Interpleader-Plaintiff,*

*v.*

CLAIRE M. NICHOLLS,
*Defendant-Cross-Defendant-Appellee,*

*v.*

BARBARA NICHOLLS,
*Defendant-Cross-Claimant-Appellant.*[*]

Appeal from the United States District Court
for the District of Connecticut.
No. 3:12-cv-01319 — Warren W. Eginton, *Judge.*

---

[*] The Clerk of Court is respectfully directed to amend the official caption to conform with the above.

ARGUED: OCTOBER 16, 2014
DECIDED: JUNE 4, 2015

Before: KEARSE, STRAUB and WESLEY, *Circuit Judges*.

Appeal from an order of the United States District Court for the District of Connecticut (Warren W. Eginton, *Judge*), granting Claire Nicholls's motion for summary judgment and denying Barbara Nicholls's motion for summary judgment. We hold that the posthumous *nunc pro tunc* domestic relations orders constitute valid "qualified domestic relations orders" that properly assign plan funds to Claire Nicholls with respect to the three retirement and pension plans specified therein, but that they have no such effect on a fourth plan not so specified. Accordingly, we AFFIRM in part and REVERSE in part the judgment of the District Court.

Judge WESLEY concurs in part and dissents in part, in a separate opinion.

KENNETH VOTRE, Votre & Associates, P.C., East Haven, CT, *for Barbara Nicholls*.

SUSAN E. NUGENT, Murphy & Nugent, LLC, New Haven, CT, *for Claire M. Nicholls*.

STRAUB, *Circuit Judge*:

Yale-New Haven Hospital brought this interpleader action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to resolve competing claims by Barbara Nicholls and Claire Nicholls to certain funds held in the four retirement and pension plans of the late Harold Nicholls. Barbara Nicholls, the surviving spouse of Mr. Nicholls, argues that the funds are payable to her because she is the named beneficiary in the plan documents. Claire Nicholls, the former spouse of Mr. Nicholls, contends that a portion of those funds are instead payable to her. She argues that three state court orders—her divorce settlement agreement and two *nunc pro tunc* orders entered after Mr. Nicholls's death—constitute qualified domestic relations orders ("QDROs") within the meaning of ERISA and thus validly assign those funds to her. The District Court granted summary judgment in favor of Claire Nicholls on the ground that the divorce settlement

agreement constitutes a QDRO applicable to all four retirement plans.

We find that the divorce settlement agreement does not constitute a QDRO because the agreement fails to comply with the requirements of 29 U.S.C. § 1056(d)(3)(C). We conclude, however, that the *nunc pro tunc* orders constitute valid QDROs that assign funds to Claire Nicholls from the three retirement and pension plans named in the orders. But because the *nunc pro tunc* orders do not clearly specify the fourth plan, we conclude that the orders do not assign funds from that plan to Claire Nicholls. We therefore affirm the judgment of the District Court with respect to the three plans specified in the *nunc pro tunc* orders, and reverse the judgment as to the fourth plan.

**BACKGROUND**

At issue here is whether the domestic relations orders identified by Claire Nicholls constitute "qualified domestic relations orders" within the meaning of ERISA. Unless they are QDROs, the

orders cannot compel the transfer of funds from Mr. Nicholls's retirement and pension plans to Claire Nicholls. Generally, ERISA precludes the assignment or alienation of benefits under covered plans, 29 U.S.C. § 1056(d)(1), and preempts state laws that "relate to" employee benefits plans, *id*. § 1144(a). However, ERISA's anti-assignment and -alienation provisions do not apply to, and ERISA does not preempt, "qualified domestic relations orders." *Id*. §§ 1056(d)(3)(A), 1144(b)(7); *see also Boggs v. Boggs*, 520 U.S. 833, 846–47 (1997).

### A. Qualified Domestic Relations Orders

The exception of QDROs from ERISA's alienation and preemption provisions was a product of the Retirement Equity Act of 1984 ("REA"), which took effect for relevant purposes on January 1, 1985. *See* Pub. L. No. 98–397, 98 Stat. 1426 (1984). Prior to the REA, ERISA had the unintended effect of "disturbing interests and expectations" in state-court matrimonial disputes, in which

employment benefits were commonly at issue. *Metro. Life Ins. Co. v. Bigelow*, 283 F.3d 436, 441 (2d Cir. 2002). One of the REA's "central purposes" was to protect "the spouse and dependent children in the event of divorce or separation" and the "surviving spouse" in "the event of death," *Boggs*, 520 U.S. at 847, and the REA was thus designed to give effect to divorce decrees and related state-court orders insofar as they pertained to ERISA-regulated plans, *see Bigelow*, 283 F.3d at 441.

The REA defines a QDRO as a domestic relations order that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan . . . ."[1] 29 U.S.C. § 1056(d)(3)(B)(i)(I). In order to qualify as a QDRO,

---

[1] "The term 'alternate payee' means any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K).

a domestic relations order must also meet several other requirements. As is relevant here:

> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—
>
>> (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>>
>> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
>>
>> (iii) the number of payments or period to which such order applies, and
>>
>> (iv) each plan to which such order applies.

*Id.* § 1056(d)(3)(C).

**B.    Harold Nicholls and Claire Nicholls's Divorce and Settlement Agreement**

On September 5, 2008, the Connecticut Superior Court for the Judicial District of New Haven divorced Harold Nicholls and Claire Nicholls by entering a Judgment for Dissolution of Marriage. A "Settlement Agreement/Stipulation To Judgment" ("Settlement

Agreement"), also dated September 5, 2008, was incorporated by reference into the Judgment for Dissolution of Marriage.

The Settlement Agreement provided, *inter alia,* that: "The Husband shall transfer to the wife one half of that portion of his PENSION and RETIREMENT ACCOUNTS, which were accumulated during the marriage. This will include the marital portion of annual deposit, if any, for the year 2008, which has not yet been made." App'x at 26 ¶ 16.2. The Settlement Agreement also provided that:

> Since the division of [the pension and retirement plans] is as of the date of the final decree for dissolution of marriage, the wife shall share, in proportion to her ownership interest in the asset, in all earnings, gains, losses, appreciation, and/or depreciation, due to market activity from the date of the final decree for dissolution of marriage to the date of the actual assignment and transfer.

*Id*. at 26 ¶ 16.2(B).

The Settlement Agreement further provided that:

> The parties agree that the Court granting the dissolution of their marriage shall retain jurisdiction to amend the aforesaid orders regarding the assignment and transfers to the wife from said retirement plans or retirement accounts for the purposes of establishing or maintaining a Qualified Domestic Relations Order under the Retirement Equity Act of 1984 acceptable to plan administrators and with provisions which carry out the intent of the division of the parties' retirement assets.

*Id*. at 27 ¶ 16.6. No funds were transferred from Mr. Nicholls's

pension and retirement plans to Claire Nicholls during his lifetime.

**C.     Mr. Nicholls's Remarriage and Death**

In 2009, Mr. Nicholls married Barbara Nicholls. Mr. Nicholls

died on February 11, 2012. At the time of his death, Mr. Nicholls

was a participant in four retirement and pension plans: (1) the Yale-

New Haven Hospital Cash Account Pension Plan ("CAP Plan"),

(2) the Yale-New Haven Hospital Matching Tax Shelter Annuity

Plan ("Matching Plan"), (3) the Yale-New Haven Hospital Section

403(b) Tax-Sheltered Annuity Plan ("403(b) Plan"), and (4) the Yale-

New Haven Hospital and Tax-Exempt Affiliates 457 Non-Qualified

Deferred Compensation Plan ("457 Plan").  Barbara Nicholls was the named beneficiary of each of these plans.

### D.    The Posthumous Domestic Relations Orders

On June 18 and August 1, 2012, Judge Bernadette Conway of the Connecticut Superior Court for the Judicial District of New Haven signed two *nunc pro tunc*[2] "Qualified Domestic Relations Order[s]" directing the plan administrator to distribute to Claire Nicholls her benefit in three of the late Mr. Nicholls's retirement and pension plans:  (1) the CAP Plan, (2) the Matching Plan, and (3) the 403(b) Plan.  The fourth plan in which Mr. Nicholls was a participant, the 457 Plan, was not named in either order.  Each order specified that "the Court intends that this Order shall be a Qualified Domestic Relations Order . . . as that term is used in Section 206(d)

---

[2] "*Nunc pro tunc*, Latin for 'now for then,' refers to a court's inherent power to enter an order having retroactive effect." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 214 (2d Cir. 2014) (internal quotation marks omitted).

of the Employee Retirement Income Security Act of 1974."  App'x at 41, 46.

**E.      Procedural History**

The plan administrator, Yale-New Haven Hospital, received competing claims from Barbara Nicholls and Claire Nicholls for certain funds in the three retirement and pension plans specified in the *nunc pro tunc* orders, as well as the fourth plan not specified therein.  To resolve those claims, the plan administrator filed an interpleader complaint in the U.S. District Court for the District of Connecticut.

The District Court granted summary judgment in favor of Claire Nicholls and denied Barbara Nicholls's motion for summary judgment.  In so ordering, the District Court found the September 5, 2008 dissolution of marriage judgment "to be a qualified domestic relations order in that it substantially complies with 29 U.S.C.

§ 1056(d)(3)(B)(i)." *Yale-New Haven Hosp. v. Nicholls*, No. 3:12-cv-01319, 2013 WL 6331256, at *3 (D. Conn. Dec. 5, 2013).

This timely appeal followed.

**DISCUSSION**

Barbara Nicholls raises two arguments on appeal. We agree with her first argument, but reject her second. *First*, Barbara Nicholls asserts that the divorce settlement agreement between Claire Nicholls and Mr. Nicholls does not constitute a QDRO because it fails to fully comply with the requirements of 29 U.S.C. § 1056(d)(3)(C). Claire Nicholls, relying on our holding in *Metropolitan Life Insurance Co. v. Bigelow*, 283 F.3d 436 (2d Cir. 2002), responds that the Settlement Agreement is a QDRO because it substantially complies with the statute. Because the "substantial compliance" rule announced in *Bigelow* does not apply to domestic relations orders—like this one—which were entered after the 1985 effective date of the REA, the Settlement Agreement does not constitute a QDRO.

*Second*, Barbara Nicholls argues that the two *nunc pro tunc* orders do not constitute valid QDROs because they were entered after the death of Mr. Nicholls. However, Congress has made clear that domestic relations orders are not invalid simply because they were entered after the death of the plan participant. We therefore hold that the *nunc pro tunc* orders are qualified domestic relations orders within the meaning of ERISA.

**I. The Settlement Agreement does not constitute a QDRO.**

The Settlement Agreement does not constitute a QDRO because it fails to satisfy the requirements of 29 U.S.C. § 1056(d). In particular, the agreement does not "clearly specif[y]" (1) a mailing address for either Claire Nicholls or Mr. Nicholls, *see* 29 U.S.C. § 1056(d)(3)(C)(i), or (2) the plans to which it applies, *see id*. § 1056(d)(3)(C)(iv).

Although the Settlement Agreement fails to meet the statutory requirements for QDROs, the District Court held, and Claire Nicholls argues on appeal, that the Settlement Agreement

nevertheless constitutes a QDRO because it "substantially complies" with ERISA's requirements. In holding that "substantial compliance" with the REA's QDRO provisions was sufficient to effect an assignment of plan benefits, the District Court relied on our holding in *Bigelow*. *See Nicholls*, 2013 WL 6331256, at *2-3.

*Bigelow* involved a settlement agreement that, like the one at issue in this case, failed to specify the mailing addresses of the participant and alternate payees. 283 F.3d at 443. The *Bigelow* court treated the settlement agreement as if it were a QDRO because it "substantially complie[d]" with ERISA's requirements for QDROs. *Id*. at 444.

The settlement agreement at issue in *Bigelow*, however, was entered into in 1983, two years before the REA's strict QDRO provisions took effect. *See id*. at 442-43. Recognizing that many pre-REA divorce settlements and decrees ran afoul of the specificity requirements for QDROs set forth in the statute, Congress expressly

provided that plan administrators could treat domestic relations orders entered before January 1, 1985 "as a qualified domestic relations order even if such order does not meet the requirements" for a QDRO.  Pub. L. No. 98-397, § 303(d), 98 Stat. 1426 (1984). Relying on this exception, we "join[ed] the Sixth Circuit in holding that ERISA does not require 'literal compliance' with respect to domestic relations orders *entered prior to* January 1, 1985." *Bigelow*, 283 F.3d at 443 (emphasis added) (quoting *Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 422 (6th Cir. 1997)).

*Bigelow*'s substantial compliance rule does not apply to post-1984 domestic relations orders like the one at issue here.  The QDRO exception created by the REA unambiguously states that "[a] domestic relations order meets the requirements of this subparagraph *only if* such order *clearly specifies*" the information identified in subsections (i)-(iv).  29 U.S.C. § 1056(d)(3)(C) (emphases added).  The "substantial compliance" rule is therefore in tension

with Congress's clear mandate. Although Congress counseled leniency for noncompliant domestic relations orders entered before the enactment of the QDRO exception, no such basis exists for excluding post-enactment orders from the REA's explicit requirements.

We therefore follow the clear intent of Congress in holding that the substantial compliance rule announced in *Bigelow* does not apply to domestic relations orders issued after January 1, 1985. *See Hawkins v. Comm'r of Internal Revenue*, 86 F.3d 982, 992 (10th Cir. 1996) ("To accept anything less than what [the QDRO statute] expressly requires would contravene the Supreme Court's frequent admonition that courts must not read language out of a statute."). As a result, the Settlement Agreement here, which failed to fully comply with all of the statutory requirements, is not a QDRO.[3]

---

[3] To the extent that certain of our sister circuits have found post-1984 domestic relations orders to constitute QDROs without satisfying the clear requirements of 29 U.S.C. § 1056(d)(3)(C), *see Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207

**II.     The two *nunc pro tunc* orders are valid QDROs.**

Although the Settlement Agreement cannot function as a QDRO, the two *nunc pro tunc* orders are in fact QDROs, and they provide an independent basis to affirm as to the three plans named therein—the CAP Plan, the Matching Plan, and the 403(b) Plan. However, because a QDRO must "clearly specif[y] . . . each plan to which such order applies," 29 U.S.C. § 1056(d)(3)(C), we must reverse as to the plan not named in either *nunc pro tunc* order—the 457 Plan.

Barbara Nicholls does not dispute that the *nunc pro tunc* orders satisfy the requirements of 29 U.S.C. § 1056(d) with respect to

---

F.3d 1143, 1151-53 (9th Cir. 2000), *cert. denied*, 531 U.S. 1074 (2001); *Metro. Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1084-85 (7th Cir. 1994), we find their opinions to be in conflict with the statute's plain meaning and therefore unpersuasive, *see Stewart*, 207 F.3d at 1160 (O'Scannlain, J., dissenting) ("[C]ourts are without authority to revise the [QDRO] statute as it was enacted by Congress."); *Hawkins*, 86 F.3d at 992 ("[R]elaxing the requirements of [the QDRO provision]—or, as *Wheaton* seems to suggest, eliminating them altogether in some cases—does violence to the plain meaning of the statute.").

the three named plans; rather, she argues that the orders are invalid because they were entered after Mr. Nicholls's death.

Domestic relations orders entered after the death of the plan participant can be QDROs. In the Pension Protection Act of 2006, Congress made clear that a QDRO will not fail solely because of the time at which it is issued, *see* Pub. L. No. 109–280, § 1001, 120 Stat. 780 (2006), although several of our sister circuits had already reached that conclusion, *see, e.g.*, *Files v. ExxonMobil Pension Plan*, 428 F.3d 478, 490-91 (3d Cir. 2005) (finding that a posthumous order constituted a QDRO), *cert. denied*, 547 U.S. 1160 (2006); *Patton v. Denver Post Corp.*, 326 F.3d 1148, 1153-54 (10th Cir. 2003) (same); *Hogan v. Raytheon Co.*, 302 F.3d 854, 857 (8th Cir. 2002) (same); *Trs. of Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 421-23 (9th Cir. 2000) (same). In the Pension Protection Act, Congress mandated that the Secretary of Labor issue regulations under ERISA clarifying that:

a domestic relations order otherwise meeting the requirements to be a qualified domestic relations order . . . shall not fail to be treated as a qualified domestic relations order solely because—

> (A) the order is issued after, or revises, another domestic relations order or qualified domestic relations order; or

> (B) *of the time at which it is issued*[.]

Pub. L. No. 109–280, § 1001 (emphasis added). The Department of Labor subsequently codified Congress's intent, and issued regulations providing that "a domestic relations order shall not fail to be treated as a qualified domestic relations order solely because of the time at which it is issued." 29 C.F.R. § 2530.206. The regulations provide the following example of the rule's application, entitled "Orders issued after death":

> Participant and Spouse divorce, and the administrator of Participant's plan receives a domestic relations order, but the administrator finds the order deficient and determines that it is not a QDRO. Shortly thereafter, Participant dies while actively employed. A second domestic relations order correcting the defects in the first order is subsequently submitted to the plan. The second order does not fail to be treated as a QDRO solely because it is issued after the death of the

Participant. The result would be the same even if no order had been issued before the Participant's death, in other words, the order issued after death were the only order.

*Id.* It is therefore clear that the posthumous nature of the two *nunc pro tunc* orders does not affect their validity.

The dissent suggests that the posthumous orders could not have properly assigned plan benefits to Claire Nicholls because those benefits had already vested in Barbara Nicholls at the time of Mr. Nicholls's death. *See* Dissent at 8-19. However, this concern is unwarranted for two reasons.

First, the purpose of a *nunc pro tunc* order is to render that order effective as of a previous date. *See In re World Trade Ctr.*, 758 F.3d at 214. The *nunc pro tunc* orders here are intended to be effective as of September 5, 2008—the date the Judgment for Dissolution of Marriage was entered. The orders were based on a settlement agreement entered before Mr. Nicholls's death that specifically contemplated the drafting and issuance of a QDRO at a

later time and that provided for the court's continuing jurisdiction over that later proceeding. *Cf. In re Gendreau*, 122 F.3d 815, 818 (9th Cir. 1997) ("The QDRO provisions of ERISA do not suggest that [the former spouse] has no interest in the plans until she obtains a QDRO, they merely prevent her from enforcing her interest until the QDRO is obtained." (emphasis omitted)), *cert. denied*, 523 U.S. 1005 (1998). The *nunc pro tunc* orders, as valid QDROs, therefore effectively assign benefits to Claire Nicholls before Mr. Nicholls's death and before any interest in the plans could vest with Barbara Nicholls.[4]

---

[4] The dissent suggests that *nunc pro tunc* QDROs may permit "federal time travel at the stroke of a state judge's pen." Dissent at 9. We respectfully disagree. *See Samaroo v. Samaroo*, 193 F.3d 185, 194 (3d Cir. 1999) (Mansmann, J., dissenting) ("Imposing a cut-off date by which a state court's orders must be in prescribed form—a cut-off that does not appear anywhere in the text of ERISA—would unnecessarily impede those courts' efforts to provide for a just disposition of marital assets."); Gary A. Shulman, *Qualified Domestic Relations Order Handbook* § 7.06 (3d ed. 2014) ("Although some . . . might consider a *nunc pro tunc* QDRO to be an attempt to rewrite history, this is hardly the function of the *nunc pro tunc* QDRO. It is meant to clarify the entitlements already memorialized in the parties' judgment entry. In short, the *nunc pro tunc* QDRO is a necessary tool of the court to effectuate a previously awarded property right."); *see also* Howard A.

Second, where a plan administrator must determine whether a domestic relations order is a QDRO, any interest in plan benefits does not vest automatically with a surviving spouse. *See* 29 U.S.C. § 1056(d)(3)(H). Indeed, ERISA provides for certain procedures that require a plan administrator to protect an alternate payee's potential interest in plan funds:

> During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts . . . which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

---

Massler & Linda M. Wallimann, 3 *Valuation and Distribution of Marital Property* § 47.17 (2014) ("Equitable considerations . . . favor recognizing QDROs issued *nunc pro tunc*. If an alternate payee automatically lost any right to plan proceeds once an event occurred that, absent an enforceable QDRO would make the proceeds payable to someone else, then a plan participant's retirement, the vicissitudes of court scheduling, or *a plan participant's death*, all events beyond the control of the alternate payee, could determine the parties' substantive rights." (emphasis added)).

*Id.* § 1056(d)(3)(H)(i); *see also Files*, 428 F.3d at 489 ("[P]ursuit of a QDRO posthumously comes within the ambit of the 'qualification' process contemplated by 29 U.S.C. § 1056(d)."). If the order is determined to be a QDRO within eighteen months of the date on which "the first payment would be required to be made under the domestic relations order," the plan administrator must pay the required amounts to the alternate payee.[5] 29 U.S.C. § 1056(d)(3)(H)(ii)-(v); *see also Tise*, 234 F.3d at 422 ("[T]he evident purpose of the 18-month period was to provide a time in which any defect in the original [domestic relations order] could be cured.").[6]

---

[5] ERISA provides that, if a QDRO determination is not made within the eighteen-month period discussed above, the plan administrator must pay the person "who would have been entitled to such amounts if there had been no order." 29 U.S.C. § 1056(d)(3)(H)(iii)(II). If the order is determined to be a QDRO after that eighteen-month period, the payments to the alternate payee are to be made prospectively. *Id.* § 1056(d)(3)(H)(iv).

[6] The dissent suggests that *Tise* is distinguishable because—unlike this case—"the plan administrator was placed on notice of the alternate payee's state DRO-created interest . . . before the participant's death." Dissent at 17-18. However, the Department of Labor has expressly rejected this argument: "A number of commenters were concerned that Example (1) . . . could be interpreted as requiring a plan fiduciary to reject a posthumous order if the plan fiduciary was

A surviving spouse therefore does not gain an irrevocable right to plan benefits until after the plan administrator has determined that a domestic relations order is not qualified. Up until that point, a surviving spouse can "lose" his or her putative interest to an alternate payee. Thus, Barbara Nicholls did not gain an automatic and irrevocable interest in Mr. Nicholls's plan benefits on the date of his death.[7]

---

not given notice of that order before the death of the participant. The Department does not agree with that interpretation of the example. . . . Nothing in the example should be construed as a requirement under section 206 of ERISA that an otherwise valid posthumous order fails to be a QDRO merely because the plan was not put on notice of the order while the participant was alive." *Final Rule Relating to Time and Order of Issuance of Domestic Relations Orders*, 75 Fed. Reg. 32,846, 32,848 (June 10, 2010) (to be codified at 29 C.F.R. pt. 2530).

[7] The dissent cites to "numerous courts" that have concluded—in the dissent's view—that "spouse benefits vest in the participant's spouse at the time of the participant's retirement or preretirement death." Dissent at 11. However, we see three problems with the authorities offered by the dissent. First, those cases are in tension with ERISA procedures which protect the potential interest of an alternate payee in plan funds even after the start date of an annuity. *See, e.g.*, 29 U.S.C. § 1056(d)(3)(H). Second, the dissent's cases address only the distribution of annuity benefits and do not involve qualified preretirement survivor annuity benefits, which appear to be the type of annuity benefits at issue in this case. *See* Dissent at 3-4. Third, two of the three court of appeals cases on which the dissent relies—*Rivers v. Central & South West Corp.*, 186 F.3d 681 (5th Cir. 1999) and *Hopkins v. AT&T Global Information Solutions Co.*, 105 F.3d 153 (4th Cir. 1997)—

The *nunc pro tunc* orders properly assign funds from the three plans named in the orders—the CAP Plan, the Matching Plan, and the 403(b) Plan—to Claire Nicholls.  However, the orders have no such effect with respect to the 457 Plan, which is not specified in either order.  *See* 29 U.S.C. § 1056(d)(3)(C)(iv).[8]

---

were decided before the Pension Protection Act of 2006.  Furthermore, in *Hopkins*, on which the dissent principally relies, *see* Dissent at 12-14, the former spouse—unlike Claire Nicholls here—"was not awarded a portion of the pension in the equitable distribution of the marital assets."  *Hopkins*, 105 F.3d at 154; *see also id.* at 157 (recognizing that "a former spouse can obtain an interest in the participant's Pension Benefits by obtaining a QDRO *at any time*" (emphasis added)).

[8] The dissent faults us for not deciding whether the two *nunc pro tunc* orders "trigger reannuitization of [Mr. Nicholls's] plan annuity benefits," Dissent at 22, and tentatively concludes that the orders "appear to violate surviving spouse annuity benefit regulations," *id*. at 19.  Because Barbara Nicholls does not rely upon these regulations or claim that the two *nunc pro tunc* orders will "trigger reannuitization," we need not address these contentions.  *See United States v. Greer*, 285 F.3d 158, 170 (2d Cir. 2002) (holding that failure to include argument in appellate brief waives argument on appeal).  In any event, we note that the two *nunc pro tunc* orders, by their terms, cannot—as the dissent fears—"reallocate[] an already-allocated benefit."  Dissent at 21; *see* App'x at 43 ("Nothing contained in this Order shall be construed to require the Plan or Plan Administrator to provide the Alternate Payee with any type or form of benefit or any option not otherwise available under the Plan; to alter the amount or form of benefits of the Participant under the Plan; to require the Plan to pay increased benefits; or to pay benefits to the Alternate Payee which are required to be paid to another alternate payee under another order determined by the Plan Administrator to be

**CONCLUSION**

We AFFIRM in part and REVERSE in part the judgment of the District Court.  Specifically, we affirm as to the three plans named in the *nunc pro tunc* orders and reverse with respect to the fourth plan, which is not named in the *nunc pro tunc* orders.  The case is REMANDED with directions to enter judgment accordingly.

---

a QDRO before this Order is determined by the Plan Administrator to be a QDRO."); App'x at 48 (same).

WESLEY, *Circuit Judge*, concurring in part and dissenting in part:

I concur with the majority that the 2008 Settlement Agreement does not constitute a qualified domestic relations order ("QDRO") both because it fails to satisfy the specificity requirements of 29 U.S.C. § 1056(d) and because it is not entitled to the substantial compliance rule announced in *Metropolitan Life Insurance Co. v. Bigelow*, 283 F.3d 436 (2d Cir. 2002). I also agree that, because the two state court *nunc pro tunc* orders nowhere identify one of the retirement and pension plans at issue, the District Court's ruling as to that plan must be reversed. I dissent, however, from the majority's holding that the two state court *nunc pro tunc* orders here serve as valid QDROs.

## DISCUSSION

### I. Background

*A. 2008 Settlement Agreement and 2012 State Court Nunc Pro Tunc Orders*

The basic facts set forth by the majority are undisputed and need only be recounted here briefly. Harold and Claire Nicholls were married for more than twenty-one years until their divorce in 2008, at which point they entered into a Settlement Agreement. That agreement was incorporated into their dissolution of marriage judgment and provided, *inter alia*, that Harold's pension and

1

retirement accounts would be evenly divided between Harold and Claire. To accomplish this, the Settlement Agreement provided that Attorney Elizabeth McMahon would prepare a QDRO necessary to accomplish the assignment, but the QDRO envisioned by the Settlement Agreement was not prepared.

Harold then married Barbara in 2009 and died a few years later in 2012 before having retired. Harold does not seem to have been a very likeable fellow. Claire's Rule 56 statement in the District Court indicated that at the time of his death, Harold was in the throes of a divorce from Barbara and that he had failed to make good on other property division aspects of his Settlement Agreement with Claire. Claire also alleges that Harold did not cooperate with attempts to draft a QDRO.

At the time of his death, Harold was a participant in four retirement and pension plans, with Barbara designated as the sole beneficiary for each of the plans: (1) the Yale-New Haven Hospital Cash Account Pension Plan ("CAP Plan"); (2) the Yale-New Haven Hospital Matching Tax Shelter Annuity Plan ("Matching Plan"); (3) the Yale-New Haven Hospital Section 403(b) Tax-Sheltered Annuity Plan ("403(b) Plan"); and (4) the Yale-New Haven Hospital

2

and Tax-Exempt Affiliates 457 Non-Qualified Deferred Compensation Plan ("457 Plan").

After Harold's death, Claire contacted Attorney McMahon to prepare a QDRO and the Connecticut Superior Court subsequently entered two posthumous QDROs — dated June 18 and August 1, 2012, but purporting to operate *nunc pro tunc* as of September 5, 2008, the dissolution of marriage judgment date — authorizing the plan administrator to distribute to Claire her portion of Harold's plan benefits, as defined by the Settlement Agreement and the QDROs.[1] The *nunc pro tunc* orders name the CAP, Matching, and 403(b) Plans, but nowhere specify the 457 Plan.

The record on appeal includes only sealed excerpts of the three specified plans, but there is no disagreement as to the general nature of these plans. The CAP and 403(b) Plans, whose terms include surviving spouse annuities, merit special attention. Both plans provide a preretirement death benefit for married participants in the form of a qualified preretirement survivor annuity ("QPSA"),

---

[1] No one contends that the QDROs misstate Claire's interest in the three identified plans, as provided for in the Settlement Agreement.

and both plans specify that the form of payment under the QPSA will be an annuity for the life of the participant's surviving spouse.[2]

## II.    The *Nunc Pro Tunc* Orders Are Not Valid QDROs

The majority concludes that the two state court *nunc pro tunc* orders qualify as QDROs because they comply with ERISA Section 206's specificity requirements, *see* 29 U.S.C. § 1056(d)(3)(C), and are not otherwise invalid. Specifically, the majority reasons (a) that posthumous domestic relations orders ("DROs") can serve as QDROs and (b) that the orders do not cause a reassignment of plan benefits because those benefits ***never vested in Barbara***. *See* Majority Opinion ("Op.") 18–26.

The majority is correct, of course, that posthumous DROs ***can*** serve as QDROs, but it nonetheless errs in giving retroactive effect to the instant *nunc pro tunc* orders for two reasons. As a threshold matter, the orders cannot serve as valid QDROs because they effect a reassignment of vested plan benefits from Barbara — Harold's surviving spouse and sole designated beneficiary — to Claire, in contravention of ERISA's statutory and regulatory scheme and underlying principles. Additionally, the orders fail as to at least two of the three

---

[2] The CAP Plan also appears to permit the alternative election of an actuarially equivalent lump sum.

plans in question because the orders contravene congressionally authorized regulations and interpretations thereof from the Department of Labor relating to surviving spouse annuity benefits.

### A. *The Pension Protection Act of 2006 and Its Regulations Do Not Support the Majority's Position*

Through its enactment of the Pension Protection Act of 2006, Pub. L. No. 109-280, § 1001, 120 Stat. 780 (2006) ("2006 Act"), Congress sought to provide domestic relations law practitioners clarity regarding the interplay between ERISA and marital property interests as asserted in QDROs. Congress directed the Secretary of Labor to issue regulations clarifying that a DRO otherwise meeting the requirements to be a QDRO would not fail to be treated as a QDRO (i) "solely because the order is issued after, or revises, another domestic relations order or qualified domestic relations order," 29 C.F.R. § 2530.206(b)(1) ("Subsequent Domestic Relations Orders"), nor (ii) "solely because of the time at which [the domestic relations order] is issued," *id.* § 2530.206(c)(1) ("Timing"). *See* Pub. L. No. 109-280, § 1001(1)(A)–(B).

The Department of Labor's regulations were accompanied by a series of examples that illustrate that a second QDRO is not invalid solely because it follows a previous QDRO; rather, it is invalid only if, as a second QDRO, it

5

purports to assign benefits already assigned to someone else. For instance,

Subsequent Domestic Relations Orders Example 1 envisions a scenario in which

the same participant and a now former-spouse secure a second QDRO either

reducing or increasing benefits that the former spouse was to receive under a

first QDRO. *See* 29 C.F.R. § 2530.206(b)(2). The example thus confirms the

ordinary proposition that a subsequent QDRO between a participant and former

spouse is not invalid simply by virtue of modifying an earlier QDRO's

assignment of benefits between the same parties. Example 2 further illustrates

the point, noting that where a valid QDRO assigns a portion of a participant's

401k benefits to a first spouse, a second QDRO may later issue assigning a

*different* portion of the same 401k plan to a second spouse. *See id.* The second

QDRO is not invalid merely because it constitutes a second QDRO regarding the

same account but will be valid as long as it does not purport to assign to the

second spouse that portion of the benefits that had already been assigned to the

first spouse.

Additionally, the regulation's Timing examples illustrate several situations

in which timing *alone* does not affect a QDRO's validity. Example 1, relied upon

by the majority, *see* Op. 21, explains that an order issued after the death of the

6

participant is not invalid *solely* because it is issued posthumously. *See* 29 C.F.R. 2530.206(c)(2). So, for example, where a noncompliant (non-QDRO) DRO is submitted to the plan administrator but the participant dies before it is corrected, or even where no order at all is issued before the participant's death, the QDRO is not invalid solely because it is issued after the participant's death. *Id*.

Critically, however, nothing in the 2006 Act or its regulations authorizes the use of a subsequent DRO, posthumous or not, to reallocate benefits vested in one payee to another payee. The statute and regulations simply note that timing *alone* cannot render a QDRO invalid. But the majority would read these authorities to say that the time of filing is irrelevant regardless of its impact on the rights of others, as long as it occurs within a grace period provided to plan administrators to sort out claims to a plan's benefits. In my view, neither the statute nor regulations supports the majority's conclusion that the two *nunc pro tunc* orders here are valid QDROs. The orders fail not "solely because the order [was] issued after, or revises, another domestic relations order or qualified domestic relations order," nor "solely because of the time at which it [was] issued." *Id.* § 2530.206(b)–(c). The two orders fail because they are posthumous,

7

subsequent domestic relations orders that *cause an unlawful reassignment of benefits* nowhere sanctioned by the statutory or regulatory scheme.

Thus, the majority's first reason in support of its position — that "[d]omestic relations orders entered after the death of the plan participant can be QDROs," Op. 19 — is as unremarkable as it is unhelpful in resolving the essential issue underlying the validity of the two *nunc pro tunc* orders as QDROs: whether plan benefits had already vested in Barbara to Claire's exclusion at the time of Harold's death. If plan benefits had already vested, then the two *nunc pro tunc* orders here cause a reassignment of benefits from Barbara to Claire, in contravention of ERISA, and cannot serve as valid QDROs.

### B. *Plan Benefits Vested in Barbara upon Harold's Death*

The majority offers two reasons why plan benefits did not vest in Barbara upon Harold's death, in spite of her status as Harold's surviving spouse and sole designated beneficiary. Neither reason is persuasive.

First, the two state *nunc pro tunc* orders — issued in June and August of 2012 — were "intended to be effective as of September 5, 2008," and, thus, according to the majority, "effectively assign[ed] benefits to Claire Nicholls before Mr. Nicholls's death and before any interest in the plans could vest with

8

Barbara Nicholls." Op. 22–23. This is a conclusion of seismic consequences that cannot possibly be correct. I am aware of no legal authority that permits a state court to issue an order and adopt a legal fiction about the order's existence earlier in time such that the state order so easily thwarts the intricate federal statutory scheme surrounding the antialienation of pension benefits. Indeed, many ERISA provisions would be inverted or rendered meaningless if state courts could engage in such federal time travel at the stroke of a state judge's pen.[3]

For example, ERISA Section 206 precludes a proposed, subsequent QDRO from allocating benefit payments to an alternate payee where a valid, prior QDRO has already designated those benefits to another alternate payee. *See* 29 U.S.C. § 1056(d)(3)(D)(iii) (providing that a proposed QDRO is valid only if it "does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously

---

[3] The majority disagrees that the state court *nunc pro tunc* power it contemplates has any potential for harm. Op. 23 n.4. But it never explores why these concerns are unfounded. Instead, the majority points to secondary sources to confirm the plain notion that *nunc pro tunc* QDROs are not *per se* invalid. I have no quarrel with certain uses of *nunc pro tunc* QDROs, and neither do the Department of Labor's regulations. I assert simply that state court *nunc pro tunc* powers are not unlimited and cannot be permitted to subvert ERISA's intricate antialienation scheme. As explained above, the *nunc pro tunc* orders here do just that.

determined to be a qualified domestic relations order"). By the majority's logic, however, a state court could adopt a legal fiction placing the second QDRO prior in time to the first. This would then produce the baffling outcome of rendering void the earlier, valid QDRO for *its* violation of Section 206. This is but one example of the bizarre results that would flow naturally from the majority's unconstrained view of state *nunc pro tunc* powers within ERISA's federal statutory context.

The majority's second reason for concluding that plan benefits did not vest in Barbara upon Harold's death is that "[a] surviving spouse . . . does not gain an irrevocable right to plan benefits until after the plan administrator has determined that a domestic relations order is not [a QDRO]." Op. 25–26. This theory lacks a firm foundation in ERISA's statutory scheme and is at odds with ERISA's underlying principles. A brief overview of the statutory landscape within which DROs function is instructive.

ERISA establishes an intricate and comprehensive federal regulatory scheme that seeks to impose efficient, predictable, and uniform national standards on employee benefit plans. *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010); *Boggs v. Boggs*, 520 U.S. 833, 841 (1997). To that end, ERISA's

antialienation and preemption provisions broadly preempt the power of state law and plan participants to alter, transfer, or encumber interests in covered retirement benefits. *See* 29 U.S.C. § 1056(d)(1); *id.* § 1144(a). As noted by the majority, Congress has recognized limited exceptions within which state domestic relations laws affecting covered plans may operate. Op. 5. Most pertinently, state DROs that comply with statutory requirements can qualify and serve as QDROs that, for our purposes, seek to identify and distribute marital property within a pension plan. 29 U.S.C. § 1056(d)(3). In contrast, orders purporting to assign interests in benefit plans but which do not qualify as QDROs *remain* preempted. *See id.* § 1056(d)(3)(A) ("[The antialienation provision] shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that [the antialienation provision] shall not apply if the order is determined to be a qualified domestic relations order.").

In light of this statutory scheme, numerous courts have concluded or implied that surviving spouse benefits vest in the participant's spouse at the time of the participant's retirement or preretirement death; I share that view. *See, e.g.,* *Rivers v. Cent. & S.W. Corp.*, 186 F.3d 681, 683–84 (5th Cir. 1999) (holding that

11

"pension benefits irrevocably vested in [surviving spouse] on the date of [participant's] retirement"); *Hopkins v. AT&T Global Info. Solutions Co.*, 105 F.3d 153, 155–56 (4th Cir. 1997) (examining ERISA Sections 205 and 206 and concluding that surviving spouse benefits under a qualified joint and survivor annuity ("QJSA") vest at the time of the participant's retirement); *Langston v. Wilson McShane Corp.*, 828 N.W.2d 109, 116 (Minn. 2013) ("We find the reasoning of the *Carmona* and *Hopkins* courts to be persuasive and adopt the rule that surviving spouse benefits generally vest under ERISA at the time of the plan participant's retirement."); *see also Carmona v. Carmona*, 603 F.3d 1041, 1059 (9th Cir. 2010) ("[A] vesting rule also promotes one of the principal goals underlying ERISA: ensuring that plans be uniform in their interpretation and simple in their application." (internal quotation marks omitted)).[4]

---

[4] The majority rejects these cases because they are purportedly "in tension with" ERISA's grace period provision. Op. 26 n.7. This begs the question, of course, since the interplay of ERISA's antialienation, QDRO, and grace period provisions is the very thing we examine here. The majority also rejects these cases because two of them — *Hopkins* and *Rivers* — were decided prior to the Pension Protection Act of 2006. *Id.* This is irrelevant because the 2006 Act does not address the competing claims to benefits vesting question at issue here or in those cases. Indeed, in the Department of Labor's statement *following* the 2006 Act, *issued in June 2010*, the Department employs **both** *Hopkins* and *Rivers* as relevant authority in expressly rejecting the posthumous reassignment of surviving spouse annuity benefits to a prior spouse. *See* 75 Fed. Reg. 32848 n.6; Dissent 20–21. If, as the majority implies, these cases are no longer good law,

Once surviving spouse benefits vest, those benefits are no longer the participant's (or his estate's) and, thus, cannot be subsequently reassigned from the participant (or his estate) to an alternate payee through a posthumous QDRO or otherwise. *See Hopkins*, 105 F.3d at 156; *Rivers*, 186 F.3d at 683–84; *Carmona*, 603 F.3d at 1054–60. Here, Harold's preretirement death triggered the vesting of survivor spouse benefits in Barbara. The posthumous QDROs purporting to assign benefits from Harold to Claire thus fail for the simple reason that Harold no longer held the benefits sought. And, as earlier discussed, it misapprehends the *nunc pro tunc* power of state court orders to allow them to so easily circumvent federally-imposed time requirements.

The majority resists this conclusion. It references several Courts of Appeals decisions in support of its position, but all of them are materially distinguishable. *See* Op. 19–20, 24–25 (citing *Files v. ExxonMobil Pension Plan*, 428 F.3d 478 (3d Cir. 2005); *Patton v. Denver Post Corp.*, 326 F.3d 1148 (10th Cir. 2003); *Hogan v. Raytheon, Co.*, 302 F.3d 854 (8th Cir. 2002); *Trs. of Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415 (9th Cir. 2000)).

---

someone ought to inform the Department of Labor, the agency entrusted by Congress to explain this thorny area of ERISA.

*Files*, *Patton*, and *Hogan* evaluated the validity of posthumous QDROs but none involved a surviving spouse and a former spouse/alternate payee's competing claims to the same benefits and none addressed the unique vesting question we confront here. Indeed, the Third Circuit in *Files* expressly distinguished the Fourth Circuit's *Hopkins* decision on this basis: "The Fourth Circuit held that the DRO was not a QDRO because the current wife's right to the survivor's benefits had already ***vested*** upon the plan participant's retirement. But, the key distinction between *Hopkins* and Files's claim is that in *Hopkins*, there was an attempt to divest benefits already vested in a subsequent spouse, whereas here, there was no such vesting . . . ." *Files*, 428 F.3d at 487 n.12 (citation omitted). The *Files* court further illustrated the key distinction by reference to a district court case that "follow[ed] *Hopkins* in preventing [the] first wife, who never put [the] plan on notice of [the] QDRO, from displacing [the] second wife as the surviving spouse as those benefits vested in [the] second wife upon [the] husband's retirement." *Id.* (citing *Singleton v. Singleton*, 290 F. Supp. 2d 767 (W.D. Ky. 2003)).

In support of its vesting theory, the majority also looks to ERISA procedures requiring that the plan administrator segregate funds payable to an

14

alternate payee while the administrator evaluates, within a specified eighteen-month grace period, whether a submitted DRO qualifies as a valid QDRO. *See* Op. 23–24 (citing 29 U.S.C. 1056(d)(3)(H)(i)). But this provision cannot bear the weight the majority places on it. First, nowhere does the provision purport to affect the vesting of benefits; it speaks only to allowing a plan administrator a grace period to evaluate a DRO after benefits have already become payable.

Second, the far-reaching vesting theory that the majority infers from this grace period provision would wreak havoc on the administrability and predictability of plan benefits. The majority's theory would permit, for example, the following nightmare situations:

Scenario One: Participant is three times married — not so far-fetched in today's world. Participant divorces Spouse One and executes a property agreement that gives her an interest in his pension. No QDRO is filed as a result of attorney indolence. Participant remarries but subsequently divorces Spouse Two, who leaves acquiring a similar (and equal) interest in Participant's pension. Spouse Two's attorney diligently files a QDRO. Participant again remarries but Spouse Three is a tolerant soul who remains married to Participant at the time of his preretirement death. She is the sole named beneficiary of Participant's death

15

benefits. In this scenario, Spouse Two and Spouse Three have interests in Participant's death benefits under ERISA. By the majority's logic, however, a state court could issue a posthumous QDRO on behalf of Spouse One that results in cutting off the interests of Spouse Three but, due to the regulations, could not undermine the interests of Spouse Two. This result is as absurd as it is inequitable.

Scenario Two: Plan Administrator and Surviving Spouse, through no fault of their own, operate wholly unaware of the existence of Former Spouse's state DRO-created interest in Participant's plan. For nearly a year and a half after the date on which the first payment would be required under the DRO, *i.e.*, within the grace period, Plan Administrator and Surviving Spouse are kept in the dark, and Plan Administrator segregates no alternate payee funds because it has no reason to do so. Then, at the eleventh hour, Former Spouse sweeps in with a posthumous DRO that she submits to Plan Administrator for qualification as a QDRO, laying claim to benefits that neither Plan Administrator nor Surviving Spouse ever had reason to believe were in jeopardy.

These illustrations of the majority's vesting theory are a far cry from the predictable outcomes and easily administrable rules that ERISA's intricate

scheme would seem to envision, and they are too drastic a departure from that scheme to justify on the basis of ERISA's grace period provision. Even courts that generally share the majority's view do not go so far.

Although the majority does not fully articulate its vesting theory, the Ninth Circuit's *Tise* decision most closely resembles the reasoning on which the majority likely rests its conclusion: a state DRO attempts to create an interest for the alternate payee in the participant's plan, the participant dies preretirement, and the state DRO is subsequently upheld as enforceable through a posthumous QDRO filed within the specified eighteen-month period such that the named beneficiary does not receive her designated benefits despite her status as such at the time of the participant's preretirement death.

But *Tise* is distinguishable in at least one critical respect: the Ninth Circuit impliedly adopts a limiting principle — nowhere found in the majority's opinion or implicit reasoning — that would assuage some of the predictability and administrability concerns arising from the earlier-identified nightmare scenarios. *Tise* involved competing claims to the same plan benefits but, there, the plan administrator was placed on notice of the alternate payee's state DRO-created interest in the participant's plan ***before the triggering event occurred***, that is,

17

before the participant's death. *See Tise*, 234 F.3d at 417–18. ERISA's grace period provision then allowed the plan administrator to segregate the alternate payee's proceeds while she sought to qualify her DRO as a QDRO within the allotted period. *Id.* at 422.

Pre-death notice was integral to the Ninth Circuit's conclusion that ERISA allows an alternate payee armed with a state DRO prior to the participant's death "to perfect the DRO into a QDRO thereafter," subject to the eighteen-month period.[5] *Id.* "Because [the alternate payee] had placed the plan on notice of her interest in [the participant's] pension plan proceeds before his death, the fact that

---

[5] The majority takes issue with this pre-death notice consideration, *see* Op. 25 n.6, but, ironically, fails to realize that this limiting principle comes from cases that *the majority* relies on to support *its* misuse of ERISA's grace period provision in order to justify *its* vesting theory. Courts that share the majority's view have adopted this limiting principle in order to dampen the effects of an otherwise unconstrained theory capable of absurd results. *See, e.g.,* Dissent 15–16. The majority's disavowal of this limiting principle thus highlights the isolation and extremity of its position.

Moreover, the majority misunderstands the Department of Labor's statement on pre-death notices because it overlooks the confusion that the statement clarifies. In regards to the Timing regulation's "Orders issued after death" example, the Department explained that where a spouse has a DRO but does not qualify it before the participant's death, the spouse's failure to submit pre-death notification of the DRO to the plan does not undermine her efforts to file a posthumous QDRO. *See* 75 Fed. Reg. 32848. But as earlier discussed, this example does not contemplate *a competing claim to benefits by a surviving spouse or second alternate payee*. Court decisions that *the majority* cites in order to support *its* vesting theory have relied on pre-death notice to limit an otherwise unconstrained view of ERISA's grace period provision *where there exists a competing claim to benefits*.

18

he died before the QDRO issued is immaterial." *Id.* at 426. Indeed, the Ninth Circuit made clear that it was "not decid[ing] whether a QDRO could issue after a participant's death if the plan had no notice of a DRO-created interest before the death." *Id.* at 426 n.9.

That is the more extreme scenario we are presented with here. Nothing in the record establishes that the plan administrator (or Barbara) was placed on notice of Claire's 2008 DRO prior to Harold's death. And for reasons earlier described, it would seriously undermine ERISA's statutory scheme and animating principles to permit Claire's posthumous orders to deny Barbara her survivor benefits, ***not exclusively but especially*** when there was no pre-death notice of the competing interest. In sum, even a generous view of ERISA's eighteen-month grace period provision exposes the majority's unbridled vesting theory as excessive and renders the state court *nunc pro tunc* orders here invalid.

### C. *The Nunc Pro Tunc Orders Likely Violate Annuity Benefit Regulations*

The *nunc pro tunc* orders also falter, with regard to at least two of the three plans at issue, because they appear to violate surviving spouse annuity benefit regulations. The Department of Labor regulations issued pursuant to the 2006 Act delineate the permissible scope of DROs issued after the starting date of an

19

annuity benefit. Applying the Timing regulation to annuity benefits, Example 3 illustrates that an order issued after the starting date of an annuity benefit is not invalid **solely** because it is issued after that start date. *See* 29 C.F.R. 2530.206(c)(2). Even after a life annuity has become payable to a participant, a QDRO may still validly issue, assigning the proceeds from that life annuity to another party. *Id.*

The example cautions, however, that although the QDRO does not fail because it issues after an annuity start date, it **would** fail under ERISA Section 206 if it requires reannuitization of the annuity benefit. *Id.* In a statement issued in conjunction with the regulations, the Department of Labor elaborates on a few such scenarios:

> Examples of an order requiring a reannuitization with a new annuity starting date would include an order issued after the annuity starting date [(i)] directing the plan to substitute one measuring life for another or [(ii)] directing the plan to change the form of benefit, such as from a single life annuity to a qualified joint and survivor annuity (QJSA) with a death benefit or from an annuity to a lump sum payment.

75 Fed. Reg. 32848. The Department's statement also indicates that even where a proposed QDRO does not require reannuitization, a posthumous reassignment

20

of surviving spouse annuity benefits to a prior spouse would nonetheless be invalid because it reallocates an already-allocated benefit:

> With regard to the principle, expressed above, that a domestic relations order issued after the annuity starting date does not violate the requirements [for QDROs] merely because the order requires the allocation of some or all of the participant's determined monthly benefit payment to an alternate payee, the Department, based on its review of sections 206 and 205 of ERISA, the case law, and other relevant guidance, is of the view that *such principle does not apply to a domestic relations order that is received after the annuity starting date and that requires an allocation to an alternate payee of some or all of the death benefit that, under the form of benefit in effect, is payable to another beneficiary.* An example of this is a plan's receipt of a domestic relations order after the annuity starting date of a QJSA that assigns to the participant's former spouse a shared payment of the participant's current spouse's survivor benefits under the QJSA.

*Id.* (emphasis added) (footnote omitted). Here, two of the three plans at issue — the CAP Plan and the 403(b) Plan — by their terms appear to include surviving spouse annuity benefits in the form of a QPSA, which are subject both to the reannuitization bar as well as to the Department's threshold rejection of posthumous QDROs purporting to reallocate "death benefits" after an annuity's starting date.

But the majority glosses over the annuity components of the CAP and 403(b) Plans. Nowhere does it adequately evaluate whether the state court *nunc*

21

*pro tunc* orders trigger reannuitization of Harold's plan annuity benefits, for example, by changing the annuity measuring life from Barbara's to Claire's, *see* Aug. 1, 2012 Nunc Pro Tunc QDRO, App. 43 ("If applicable to the form of benefits elected by the Alternate Payee [Claire], the Assigned Benefit shall be adjusted in accordance with the Plan's actuarial assumptions to be paid for the life of the Alternate Payee [Claire]."), or by changing the form of the benefit from an annuity to a lump sum payment, *see* June 18, 2012 Nunc Pro Tunc QDRO, App. 48 ("The Alternate Payee [Claire] may elect, in writing, to receive the Assigned Benefit in a single lump sum as soon as administratively feasible after this Order is accepted by the Plan Administrator."). Moreover, the majority also fails to engage in the threshold inquiry of whether these state court orders are susceptible to the Department's rejection of posthumous QDROs purporting to transfer "some or all of the death benefit" from a surviving spouse to an alternate payee after an annuity starting date. *See* 75 Fed. Reg. 32848.

The reason that the majority offers for its failure to thoroughly engage whether the two *nunc pro tunc* orders violate surviving spouse annuity benefit regulations is that Barbara's brief never raised the issue. Op. 27 n.8. But the majority fails to honor its own limiting principle, since its arguments ***in favor*** of

validating the two *nunc pro tunc* orders rely on statutory and regulatory provisions — including the 2006 Act and related Department of Labor regulations and statements — nowhere cited in either Claire's or Barbara's briefs, or in the District Court opinion.

ERISA includes a host of federal protections for pensioners and beneficiaries that exhibits multiple points of contact with state law. Because this case presents significant ERISA questions of first impression in this Circuit, both the majority and I have looked beyond the presentments of the parties. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (Marshall, J.) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *cf. Hankins v. Lyght*, 441 F.3d 96, 104 (2d Cir. 2006) ("We are required to interpret federal statutes as they are written . . . and we are not bound by parties' stipulations of law.").

But one cannot venture there halfway. To understand this statutory and regulatory scheme, one must scrutinize it from every available angle. Guidance from the agency that Congress entrusted to explain it would have been most

helpful here but, unfortunately, the Department of Labor's views have not been solicited.

## CONCLUSION

Matrimonial lawyers rarely come to federal court. But the expansion over the last forty years of how states define marital property has made federal law, and more particularly ERISA, a very important part of domestic relations law practice. Often a pension earned during a marriage is one of the few predictable streams of income or sources of value that can be found among the financial wreckage that so frequently accompanies marital discord. Juxtaposed against the significance of pension benefits in marital disputes is the congressionally-recognized need for predictability in the management and distribution of pension benefits. For over thirty years now, state and federal courts, and on occasion Congress, have sought to balance the two competing concerns by recognizing that a spouse should be given access to and ownership of all, or a portion, of the other spouse's retirement benefits through state court orders as long as those orders comply with federal law.

In my view, that did not occur here. And while Harold certainly seems the scoundrel, that is not a good reason to rely on legal fictions that may cause far

24

more harm than good in future cases simply to make right the wrong that Harold visited upon his first wife, Claire. I fear the majority's resolution of this case will only create more uncertainty and difficulty in an already muddled and frustrating area of federal law. Recognizing the two state court *nunc pro tunc* orders as valid QDROs will contravene ERISA's statutory and regulatory scheme and undermine the bright-line, predictable, and easily administrable rules critical to the efficient administration of ERISA-governed pension and retirement plans. *Cf. Kennedy v. Plan Admin. for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 301–02 (2009). For these reasons, I respectfully concur in part and dissent in part.